Filed 9/29/15

CERTIFIED FOR PARTIAL PUBLICATION[*]

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF RIVERSIDE

APPELLATE DIVISION

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>                    v.<br><br>MIGUEL VALENCIA,<br><br>        Defendant and Appellant. | APP1400147<br><br>(Trial Ct. No. RIM1315844) |

APPEAL from a judgment of the Superior Court of Riverside County, Michael B. Donner, Judge. Affirmed in part, reversed in part, and remanded.

Eric Cioffi, under appointment by the Superior Court, for Defendant and Appellant.

Paul E. Zellerbach and Michael A. Hestrin, District Attorneys, and Matt Reilly, Deputy District Attorney, for Plaintiff and Respondent.

**THE COURT**[**]

Defendant Miguel Valencia was convicted by a jury of resisting, delaying, or obstructing an officer (Count One; Pen. Code, § 148, subd. (a)(1) (hereafter section 148 or 148(a)(1))), driving on a suspended license (Count Two; Veh. Code, § 14601.2, subd. (a)), and driving under

---

[*]        Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

[**]        Raquel A. Marquez, Presiding Judge, David M. Chapman and Mark A. Cope, Judges.

1

the influence (DUI) (Count Three; Veh. Code, § 23152, subd. (a)).  He challenges the trial court's instruction to the jury on Count One, and attacks all of his convictions for error under *Miranda v. Arizona* (1966) 384 U.S. 436 *(Miranda)*.  In the published portion of this opinion, we agree with defendant that the trial court improperly instructed the jury that it could find defendant guilty of a violation of section 148 based on his refusal to submit to a chemical test after his DUI arrest.  In the unpublished portion of this opinion, we find that the trial court did not commit prejudicial *Miranda* error.  We therefore reverse Count One, but affirm defendant's convictions on Counts Two and Three.

## FACTS AND PROCEDURAL BACKGROUND

On September 11, 2013, at 1:40 a.m., California Highway Patrol Officer Brian Seel was on patrol in Riverside with another officer when they conducted a traffic stop on a car they had seen run a red light, make a wide turn, and straddle the dividing line between two lanes.  Officer Seel contacted the driver, defendant, who had his window down about two inches, but refused to roll the window down farther upon the officer's request.  Officer Seel noticed several physical signs that defendant was intoxicated: the odor of alcohol; extremely red and watery eyes; and slurred, jumbled, and repetitious speech.  The two officers asked defendant numerous times to get out of the car, but defendant refused.  An officer finally reached through the partially opened passenger window and unlocked the doors.  Officer Seel opened the driver's door and defendant eventually got out.

An overwhelming odor of alcohol came from defendant's car, but defendant denied drinking.  Defendant was very unsteady on his feet–he stumbled, had to hold onto the car door for support as he got out, was unable to walk in a straight line, continually swayed, and had to move his feet to keep balance while standing.  Officer Seel explained his intent to conduct a DUI

2

investigation, but defendant refused to answer questions or perform any field sobriety tests. Officer Seel–who testified as to his training and expertise in investigating DUIs–came to the opinion that defendant "was not safe to operate a motor vehicle," confirmed that defendant's driver's license was suspended or revoked due to a prior DUI, and placed defendant under arrest.

After the arrest, Officer Seel and defendant spoke to one another even though defendant had not been advised pursuant to *Miranda*. In response to defendant's *Miranda* objection at trial, the trial court excluded the exchange after a certain point, but admitted the first portion, apparently on the ground that it did not constitute interrogation. This initial post-arrest exchange was presented to the jury by way of a video recording and transcript.[1] In the exchange, defendant goes back and forth with the officer, challenging the officer's conclusion that he was driving under the influence, asking for leniency in the form of a warning or citation, and offering various other protests.[2]

Officer Seel also sought defendant's consent to conduct a chemical test. Defendant first indicated that he would take a breath test, but ultimately refused to provide either a breath or a blood sample. Additionally, at some point Officer Seel admonished defendant that his refusal to submit to a test would result in the suspension or revocation of his driving privilege, could be used against him in court, and would result in a fine and imprisonment in the event he was eventually convicted of a DUI. There is no indication that Officer Seel attempted to secure a warrant or conduct a forced blood draw.

---

[1] The video has not been included with the record on appeal. The contents of the video, as they are discussed in this opinion, are derived from the transcript. There is no indication or claim that the transcript does not accurately reflect the contents of the video.

[2] The length of the exchange prohibits reproduction here. Specific statements will be discussed as needed.

Erin Crabtrey, a forensic toxicologist, testified that physical impairment due to alcohol is always preceded by mental impairment, such that a person who is physically impaired is necessarily also mentally impaired. She also testified that the various aspects of defendant's driving and physical symptoms were consistent with a person who was under the influence.

As to the elements of Count One, the trial court instructed the jury with a modified version of CALCRIM No. 2656. As given, the instruction set fourth four alleged acts that could form the basis for the violation:

> The People allege that the defendant resisted, or obstructed, or delayed Brian Seel by doing the following: failing to roll down the drivers [*sic*] side window after being asked six times to do so, by failing to exit the vehicle after being ordered to do so fifteen times by more than one California Highway Patrol Officer, failing to perform Field Sobriety Tests requested by the officer *and failing to submit to a chemical test of either his breath or blood*.

(Emphasis added.) The jury was also instructed on unanimity, both as part of CALCRIM No. 2656 and a second time with CALCRIM No. 3501, that in order to find defendant guilty of a violation of section 148 they must all agree that defendant committed at least one of the alleged acts, and on which act he committed.

The jury found defendant guilty on all three counts, and the parties stipulated that he had two separate prior DUI convictions within ten years. Defendant was not charged with a chemical test refusal allegation in order to enhance his punishment for the DUI. (Veh. Code, § 23577.) The trial court placed him on summary probation for 60 months and ordered him to serve 186 days in custody. Defendant now appeals. (Pen. Code, § 1466, subd. (b)(1).)

## DISCUSSION

### I. *Defendant's Section 148 Conviction Must Be Reversed for Instructional Error*

Defendant's first argument on appeal is that his section 148 conviction must be reversed because the jury was improperly instructed that it could base a guilty verdict on his failure to

4

submit to chemical testing. He does not argue that Officer Seel was not engaged in the lawful performance of his duties when requesting defendant to submit to a test,[3] nor does he argue that his refusal did not actually obstruct the officer's investigation. Rather, he argues that an arrestee has the constitutional and statutory right to refuse. Preliminarily, the People argue that this claim is forfeited. "The rule of forfeiture does not apply, however, if the instruction was an incorrect statement of the law [citation], or if the instructional error affected the defendant's substantial rights," and to ascertain whether or not this is so ""'necessarily requires an examination of the merits of the claim–at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.""" (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.)

It appears to be an issue of first impression in California whether a DUI arrestee's refusal to submit to a chemical test can constitute a violation of section 148. We therefore solicited and received supplemental briefing from the parties.

### A. There Is No Statutory Basis for Punishing Under Section 148 a Simple Refusal to Submit to a Chemical Test

We first note that we review de novo whether the trial court's jury "instructions correctly state the law." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) Furthermore,

> "[a]s in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." [Citation.] "We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context . . . ."

(*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.) Section 148(a)(1) makes it a misdemeanor to "resist[], delay[], or obstruct[] any . . . peace officer . . . ." But ""'we must consider the [statutory language] in the context of the entire statute [citation] and the statutory scheme of

---

[3] For this reason, at least, we reject the People's suggestion that defendant had to raise his claim first in a pretrial motion under Penal Code section 1538.5.

5

which it is a part"'"" (*People v. Whaley* (2008) 160 Cal.App.4th 779, 793 [textual alterations in original]), and "language that appears clear and unambiguous on its face may be shown to have a latent ambiguity when some extrinsic factor creates a need for interpretation or a choice between two or more possible meanings" (*Varshock v. California Dept. of Forestry and Fire Protection* (2011) 194 Cal.App.4th 635, 644–45 [finding a latent ambiguity in a statute in part due to potential conflict with a separate statute in a different code]). Viewed in this way, the language of section 148 alone does not make it clear whether a DUI arrestee's act of peaceably refusing to submit to a chemical test may be prosecuted under that section, in light of the fact that such tests are governed by a careful and complicated set of statutory rules and consequences for noncompliance. We thus perceive a latent ambiguity in section 148, which permits us to "'look to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part'" in order to interpret the statute. (*People v. Leiva* (2013) 56 Cal.4th 498, 510.)

"It cannot be too often repeated that due respect for the political branches of our government requires us to interpret the laws in accordance with the expressed intention of the Legislature," and accordingly "'[t]his court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.'" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 633.) "[I]n our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and . . . such questions are in the first instance for the judgment of the Legislature alone." (*In re Lynch* (1972) 8 Cal.3d 410, 414.) "Only the Legislature . . . may determine what conduct is unlawful and the penalty for the unlawful conduct." (*People v. Figueroa* (1999) 68

6

Cal.App.4th 1409, 1415.) We therefore approach our task with deference to the Legislature's policy judgments in defining criminal offenses and determining the appropriate ranges of punishment. "'Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the Legislature may think.'" (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1385.)

"The Legislature first enacted California's original implied consent law shortly after the decision in" *Schmerber v. California* (1966) 384 U.S. 757 *(Schmerber)*, in which "the United States Supreme Court upheld a warrantless, forced blood draw done in the course of a DUI investigation where the officer was confronted with an emergency making it unfeasible to obtain a warrant before the defendant's blood alcohol dissipated . . . ." (*People v. Harris* (2014) 225 Cal.App.4th Supp. 1, 5–6.)

> "Despite the legality of such a coercive procedure, however, the Legislature recognized that 'such an episode remains an unpleasant, undignified and undesirable one.' [Citation.] In enacting [the implied consent law], the Legislature sought to obviate these consequences for the driver and 'avoid the possible violence which could erupt if forcible tests were made upon a recalcitrant and belligerent inebriate' [citation] while at the same time preserving the state's strong interest in obtaining the best evidence of the defendant's blood alcohol content at the time of the arrest."

(*Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 118 [quoting *Hernandez v. Department of Motor Vehicles* (1981) 30 Cal.3d 70, 77 *(Hernandez)*; brackets in original].) The Legislature's goal was thus to balance the rights, concerns, and dignity of the individual against the need to enforce California's DUI laws, and to avoid the unpredictability of forced blood draws. Its solution was to "devise[] an additional or alternative method of compelling a person arrested for drunk driving to submit to a test for intoxication, by providing that such person will lose his automobile driver's license for a period . . . if he refuses to submit to a test for intoxication." (*Hernandez*, at p. 77; see Veh. Code, § 13353.) In the mid-1980s, the Legislature

7

recalibrated this balance by setting forth moderately enhanced criminal penalties for refusing a chemical test, but only if the arrestee is subsequently convicted of DUI. (Veh. Code, 23577; see former Veh. Code, § 23159, added by Stats. 1985, ch. 735, § 6.)

Significantly, the Legislature has never expressly made it a stand-alone criminal offense for a DUI arrestee to refuse to submit to a chemical test. We view this to be a result of the fact that the implied consent law reflects competing policy concerns, particularly in light of the Legislature's enactment of other administrative and criminal penalties. To permit a refusal in and of itself to be independently punished under section 148–wholly outside the implied consent scheme and the Legislature's policy judgments–would be inappropriate. Not only does it usurp the Legislature's rightful authority to determine how the implied consent law is to be enforced, it undermines the policy balance the Legislature has achieved. Namely, by transforming all ordinary refusals into stand-alone misdemeanors carrying up to a year of imprisonment in the county jail, which is *double* the longest permissible jail term for a first-time DUI even with a refusal allegation (§ 148, subd. (a)(1); Veh. Code, §§ 23536, subd. (a), 23538, subd. (a)(1), 23577, subd. (a)(1)), such an interpretation entirely discards the Legislature's concern for the rights and integrity of the individual and sets up a new regime in which maximum law enforcement is the sole guiding star. Indeed, under the People's interpretation, every DUI case in which the defendant refused to submit to a chemical test could include a charge of violating section 148, rendering largely superfluous the enhanced criminal penalties for refusal upon conviction for DUI. (Veh. Code, § 23577.)

Our analysis is consistent with the rule of statutory interpretation described in *In re Williamson* (1954) 43 Cal.2d 651 *(Williamson)*, that where conduct is facially prohibited by overlapping general and special penal statutes alike, the courts must infer a legislative intent that

8

the conduct may only be prosecuted under the special statute, which constitutes an exception to the general statute. (See generally *People v. Rader* (2014) 228 Cal.App.4th 184, 194.) This rule comes into play when the two statutes are in conflict, such as where the special statute sets forth a less severe punishment than the general statute. (See generally *id.* at pp. 195–98.) As discussed, here there is a clear conflict between the general statute (§ 148(a)(1)) and the special statute (Veh. Code, § 23577) vis-à-vis criminal penalties for refusing to submit to a blood draw, with the special statute imposing a lesser punishment. This is true even in a case such as the present one, where the defendant's priors authorize a DUI sentence of up to one year in jail (Veh. Code, § 23546, subd. (a)), because while Vehicle Code section 23577, subdivision (a)(4) would require an enhancement of ten days for a refusal, prosecution under section 148 would permit the imposition of another full year in jail *in addition to* defendant's DUI sentence (*In re Claude J.* (1990) 217 Cal.App.3d 760, 763 ["in an adult sentencing on multiple misdemeanor counts, the court is free to impose consecutive sentences at the maximum term for each offense"]). The requisite implication is therefore that the Legislature intended that section 148 not be used to prosecute a DUI arrestee's refusal to submit to a chemical test. Although the special statute in this case does not define an offense, but rather authorizes enhanced penalties for a DUI, we find this distinction immaterial in determining the Legislature's intent.

The Legislature's intent can also be seen in its directions to officers regarding the proper advisements to be given to DUI arrestees. While such persons are to be informed that a refusal will carry enhanced criminal penalties in the event they are convicted of DUI, will result in negative consequences for their driving privileges, and may be used as evidence against them in court, there is no requirement that officers advise arrestees that a refusal may be punished independently under section 148. (Veh. Code, § 23612, subds. (a)(1)(D), (a)(4).) It is obvious

9

that the Legislature was concerned that arrestees be aware of the consequences of refusal, which furthers its goal of encouraging submission to chemical tests in order to avoid the use of forced blood draws. The absence in these statutory advisements of any mention of a stand-alone conviction and up to a year in jail under section 148–a penalty harsher than the listed consequences and certainly a more compelling reason to submit to a chemical test–is glaring, and strongly suggests a legislative intent to limit the consequences for refusal to those as to which officers are required to advise arrestees under the implied consent law, or at the very least an intent that no drastically greater consequence will be generally available.

We therefore conclude that, as a matter of statutory construction, defendant's mere refusal to submit to a chemical test could not be punished under section 148, and it was error for the trial court to instruct the jury that it could convict defendant on that basis alone.[4]

## B. Defendant's Conviction Under Section 148 Was Unconstitutional

Aside from the question of statutory interpretation, we find a constitutional defect with the prosecution of defendant under section 148 for failing to submit to a chemical test.

### i. Defendant's act of refusal was constitutionally protected

The United States Supreme Court has made it clear that subjecting a person to a blood, breath, or urine test constitutes a search under the Fourth Amendment. (*Skinner v. Railway Labor Executives' Ass'n* (1989) 489 U.S. 602, 616–17; see also *Maryland v. King* (2013) 569 U.S. __ [133 S.Ct. 1958, 1968–69]["[t]he Court has applied the Fourth Amendment to police efforts to draw blood . . . and even to 'a breathalyzer test'"]; *People v. King* (2000) 82

---

[4] We do not rely upon the provision in section 148(a)(1) that it only applies "when no other punishment is prescribed," since the quoted phrase arguably means that subsection (a)(1) only "applies 'when no other punishment is prescribed' by the *other* subdivisions of section 148." (*People v. Christopher* (2006) 137 Cal.App.4th 418, 432–36 [emphasis in original]; but see *People v. Quiroga* (1993) 16 Cal.App.4th 961, 969–71 [taking a broader view].)

10

Cal.App.4th 1363, 1377 ["breath, blood and urine tests certainly are an intrusion"]; *Johnetta J. v. Superior Court* (1990) 218 Cal.App.3d 1255, 1271 ["even the nonsurgical collection of breath and urine for chemical testing must be considered a search under the Fourth Amendment"].) A person has the right under the Fourth Amendment to be free from unreasonable searches, and "[g]enerally . . . warrantless searches are per se unreasonable unless the search falls within a recognized exception." (*People v. Reyes* (2011) 196 Cal.App.4th 856, 859.) While one such exception occurs in the context of chemical testing when a DUI arrestee actually consents to the test, consent must be voluntary and freely given, not coerced or given only in submission to a claim of lawful authority. (*People v. Harris* (2015) 234 Cal.App.4th 671, 685, 689–90 *(Harris)*.) Accordingly, a person has the right to refuse to consent to a search. (See *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 227.)

Furthermore, the exercise of a constitutional right cannot be punished under section 148. (See *People v. Quiroga* (1993) 16 Cal.App.4th 961, 966, 968–69 [excluding speech protected under the First Amendment from the scope of section 148].) Highly instructive in this regard is *People v. Wetzel* (1974) 11 Cal.3d 104 *(Wetzel)*. In *Wetzel*, officers were in hot pursuit of a suspect who they were informed had entered the defendant's apartment, and they requested the defendant's permission to enter. The defendant refused, and stood "passively in the doorway during the verbal exchange." (*Id.* at p. 107.) Officers arrested her, moved her out of the way, and entered the apartment. The California Supreme Court noted that while the officers would have been justified in entering the apartment due to their pursuit of the suspect, "at no time prior to defendant's arrest did the officers actually attempt or state that they intended to make such an entry"; so "[d]efendant's entire course of conduct was directed to refusal of consent, and nothing more." (*Id.* at pp. 108–09.) And "[a]lthough she had positioned [herself] in the open doorway, it

11

appeared to be the only position she could assume while conversing with the officers," meaning that she did not obstruct the officers in carrying out their independent right to enter the apartment in hot pursuit. (*Ibid.*) Accordingly, "as a matter of law . . . defendant's total conduct cannot be characterized other than a refusal to consent to a request to enter her apartment." (*Id.* at p. 109.) The court concluded that such a mere refusal–a clear invocation of a constitutional prerogative– could not support a section 148 conviction: "She had the right to withhold consent to enter and, as long as entry was not sought on any other ground than with her consent she committed no impropriety and certainly not a violation of section 148." (*Id.* at pp. 109–10.) Similarly, in *Camara v. Municipal Court of City and County of San Francisco* (1967) 387 U.S. 523, 540 *(Camara)*, the United States Supreme Court held that a person may not be constitutionally convicted of a crime for refusing to consent to a search that authorities had no independent justification to conduct.

Here, police did not attempt to obtain a warrant or to perform a forced blood draw based on another exception to the warrant requirement, such as exigent circumstances. Nevertheless, the jury was instructed, contrary to *Wetzel* and *Camara*, that it could convict defendant of a violation of section 148 based on nothing more than his exercise of the constitutional right to refuse to consent to a chemical test. This was constitutional error.

### ii. Defendant's conviction under section 148 is constitutionally distinct from the other administrative and criminal penalties for refusal

But if a DUI arrestee has a constitutional right to refuse consent to a chemical test, how can it be that such a refusal may constitutionally carry other administrative and penal consequences? (Veh. Code, §§ 13353, 23577; see *Harris*, *supra*, 234 Cal.App.4th at pp. 686– 89.) After all, "'[i]t has long been established that a State may not impose a penalty upon those

12

who exercise a right guaranteed by the Constitution. . . . "Constitutional rights would be of little value if they could be . . . indirectly denied," . . . .'" (*Dunn v. Blumstein* (1972) 405 U.S. 330, 341 [ellipses in original].)  With regard to administrative penalties–i.e., driver's license suspension–there is no fundamental right to drive, and so a restriction on that privilege based on the refusal to submit to a chemical test is constitutional so long as there is a rational basis for it, which there is.  (*Hernandez*, *supra*, 30 Cal.3d 70.)  But in the present case the question is not one of driver's license suspension, but deprivation of liberty as punishment for refusing consent.  For guidance on that front we turn to *Quintana v. Municipal Court (People)* (1987) 192 Cal.App.3d 361 *(Quintana)*, where the court upheld the constitutionality of increased criminal penalties for refusal in the event the arrestee was convicted of DUI.  The Court of Appeal explained that since such a penalty implicates the fundamental right to liberty, as a matter of substantive due process it is only valid if it satisfies the strict scrutiny test.  (*Id.* at p. 368.)  The statute at issue did, in fact, meet strict scrutiny due largely to the state's strong interest in "a fair, efficient and accurate system of detection and prevention of driving under the influence," which "is obviously thwarted by the inebriated driver who refuses the test," who "has forced the police officers to risk the possible violence of a forcible test or to forego the best evidence of intoxication," and who "has thus proven to be more dangerous to the public than the inebriated driver who has consented to a test."  (*Ibid.*)  Additionally, there were no "'"less drastic means" available to accomplish the government's purpose,'" in light of the Legislature's unchallenged finding "that the 'state's drunk driving laws are not completely effective because of the refusal by many drivers to take the required chemical tests which show their intoxication'" despite the consequences to their driving privilege for doing so.  (*Id.* at p. 369 [quoting Stats. 1985, ch. 735, § 1].)  The *Quintana* court also explained that since the increased criminal penalties were permissible as a matter of

13

due process, it followed that they were lawful under the Fourth Amendment as a condition on the right to refuse consent. (*Id.* at p. 367.) On this basis–the existence of a statute criminally penalizing a refusal which itself met strict scrutiny–the court distinguished *Wetzel*.

The discussion in *Quintana* remains consistent with modern substantive due process jurisprudence, which "'forbids the government to infringe certain "fundamental" liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.'" (*In re Lira* (2014) 58 Cal.4th 573, 585 [emphasis in original]; accord *H.S. v. N.S.* (2009) 173 Cal.App.4th 1131, 1142.) While this does not mean that penal statutes in general must be analyzed under the strict scrutiny framework (see *People v. Wilkinson* (2004) 33 Cal.4th 821, 836–38 [so holding in the similar equal protection context]), in both *Quintana* and this case there is an additional factor militating in favor of strict scrutiny analysis: the impingement on the Fourth Amendment right to be free from unreasonable searches, and the related right to withhold consent to a search.

The compelling state interest here is the same as that identified in *Quintana*: the interest in fairly, efficiently, and accurately detecting and combating driving under the influence. But here, section 148 as applied to defendant's refusal to submit to a chemical test is not narrowly tailored to serve that interest. In the substantive due process context, an action is narrowly tailored if "it is the least restrictive and least harmful means of satisfying the government's goal . . . ." (*U.S. v. Brandon* (6th Cir. 1998) 158 F.3d 947, 960; see *Quintana*, *supra*, 192 Cal.App3d at p. 369; cf., e.g., *Prigmore v. City of Redding* (2012) 211 Cal.App.4th 1322, 1341–42 [in the different context of a content-neutral restriction on *speech*, narrow tailoring does not require the use of the least restrictive means].) Unlike in *Quintana*, here we have no legislative findings regarding the ineffectiveness of the lesser penalties which have been in place for decades, or the

need for enhanced penalties; indeed, we have no reason at this point, on this record, to believe that less restrictive administrative and criminal penalties have been insufficient or lacking in any way. Since the narrow tailoring requirement has not been met, it would thus be unconstitutional in this case to penalize defendant under section 148 for exercising his right to refuse to consent to a chemical test.[5]

*Harris* does not undermine our analysis. In that case the defendant had consented to a blood test after being arrested for DUI, and the Court of Appeal confirmed that such actual consent rendered the blood test lawful under the Fourth Amendment. In the course of so holding, the court stated "that admonition under the implied consent law of the consequences of refusing to submit to a chemical test does not *always* result in coerced consent," and explained that in the case before it the ordinary consequences in California for failing to submit to a chemical test, and advisement regarding those consequences, did not render the defendant's consent involuntary. (*Harris*, *supra*, 234 Cal.App.4th at pp. 682, 686–92 [emphasis added].) The *Harris* court thus did not confront the situation where the arrestee refuses consent and the state attempts to punish that refusal under section 148. It did not analyze whether such application of section 148 is constitutionally or statutorily permissible, nor was it called upon to conduct a due process analysis of a novel, additional, and greater penalty for a refusal; rather, it upheld the status quo by reaffirming, after the United States Supreme Court's decision in *Missouri v. McNeely* (2013) 569 U.S. __ [133 S.Ct. 1552] *(McNeely)*, the continuing validity of

---

[5] While the court in *Quintana* did state that "[t]he Legislature could have chosen to penalize all drivers who refused a lawful test," in context this is not a declaration that the Legislature in fact has such power but rather part of the court's explanation of why the statute in question–which was limited to increased penalties upon conviction for DUI–was narrowly tailored. (*Quintana*, *supra*, 192 Cal.App.3d at p. 369.) In other words, it was an observation that the Legislature did not pursue the most hardline option that it might have considered.

the venerable administrative and criminal penalties that were upheld against previous constitutional challenges in *Hernandez* and *Quintana*.

Nor does the case authority that guided the *Harris* court's reasoning require us to reach a different conclusion.  (See *Harris*, *supra*, 234 Cal.App.4th at pp. 686–89.)  In *McNeely*, *supra*, 133 S.Ct. at p. 1566 (plur. opn. of Sotomayor, J.), the plurality extolled the virtues of implied consent laws that "impose significant consequences when a motorist withdraws consent," namely driver's license suspension or revocation and the use of the refusal as evidence in a subsequent criminal prosecution; but the plurality made no mention of laws that go further and impose stand-alone criminal penalties for a refusal.  Likewise, in *South Dakota v. Neville* (1983) 459 U.S. 553 *(Neville)*, the United States Supreme Court found no Fifth Amendment violation in using an arrestee's refusal against him in a later DUI trial, but had no cause to consider the constitutionality of a stand-alone criminal prosecution for refusal as a question of due process.  And in *State v. Moore* (Or. 2013) 318 P.3d 1133, the Oregon Supreme Court found the defendant's consent to blood and urine tests voluntary, rejecting the idea that an advisement as to the consequences for refusal renders any consent coerced; but while one potential consequence was to be subject to a stand-alone traffic violation carrying a fine (Or. Rev. Stat., § 813.095), there is no indication that jail time would be available, unlike the year of jail that a section 148 conviction authorizes.  Additionally, the court was careful to explain that advisement regarding the consequences for refusal was not unconstitutionally coercive "*if it is permissible for the state to impose that penalty . . . .*" (*State v. Moore*, at p. 1138 [emphasis added].)  This is quite similar to the analysis used by the *Quintana* court in distinguishing *Wetzel*, in which it reasoned that there would be no Fourth Amendment violation if the statute imposing a penalty for exercising the right to refuse was otherwise constitutionally appropriate as a matter of due process.

16

(*Quintana*, *supra*, 192 Cal.App.3d at pp. 367–69.) Finally, in *State v. Brooks* (Minn. 2013) 838 N.W.2d 563, the Minnesota Supreme Court held that the defendant's consent to chemical tests was not coerced by the consequences for refusal. Though one of the possible consequences was indeed a stand-alone prosecution for a gross misdemeanor carrying a base punishment of up to a year's imprisonment (Minn. Stat., §§ 609.03, 169A.20, subd. 2, 169A.26), the due process question was not clearly presented in *State v. Brooks*, as it is here, and the existence of such an enhanced penalty was irrelevant to the point the *Harris* court was making in its discussion of that case, which was that "'a driver's decision to agree to take a [chemical] test is not coerced' *solely* because that state's implied consent law imposes criminal penalties for refusing to comply" (*Harris*, at p. 688 [brackets in original; emphasis added]). This is fully consistent with our conclusion, since we do not base our decision on the mere fact of criminal penalties alone, but rather the specific and unique application of section 148 to this novel scenario. We note that even in Minnesota a refusal without the use or threat of force or violence does not constitute the specific crime of obstructing legal process, which appears to be analogous to section 148. (Minn. Stat., §§ 609.50, 169A.52, subd. 1.)

We recognize that the Minnesota Supreme Court in a more recent case did uphold the stand-alone offense of refusing to submit to a chemical test against a substantive due process challenge, over the dissent of two justices, on the ground that refusal to consent to a breath test is not a fundamental right because–despite *McNeely*'s rejection of a rule that a warrantless, forced blood sample may be obtained in every DUI case under the exigent circumstances doctrine–a sample may in any event be obtained under the search incident to arrest exception to the warrant requirement. (*State v. Bernard* (Minn. 2015) 859 N.W.2d 762.) The decision in that case is obviously not binding on this court. (*US Ecology, Inc. v. State* (2005) 129 Cal.App.4th 887,

905.) In any event, we agree with the dissenting justices that the majority's view ignores the import of *McNeely*, and indeed, does away with *McNeely* entirely:

> It strains credulity to suppose that, after the Supreme Court carefully examined the exigent-circumstances exception in *McNeely,* it would conclude in some future case that the search would have been justified anyway under the search-incident-to-arrest doctrine, which . . . turns on the same rationale regarding the preservation of evidence that the Supreme Court explicitly rejected in *McNeely*. [Citations.] In fact, by . . . creating a novel bright-line rule, the court simply readopts a per se exigency under a different name.

(*State v. Bernard*, at pp. 774, 778–79 (dis. opn. of Page and Stras, JJ.).) We further note that the exigent circumstances and search incident to arrest exceptions have historically been intertwined in the context of chemical samples in DUI cases, and cannot be casually differentiated. In *Schmerber*, the predecessor case to *McNeely*, the United States Supreme Court

> found that the warrantless, forced blood draw in that case complied with the Fourth Amendment as "an appropriate incident to petitioner's arrest." [Citations.] But despite the *Schmerber* court's own characterization of its holding, its conclusion "did not turn on the existence of a valid prior arrest. To the contrary, the court relied almost exclusively on the exigency created by the evanescent nature of blood alcohol and the danger that important evidence would disappear without an immediate search." [Citation.] Today, the *Schmerber* rule is fully understood to be an application of the exigent circumstances exception to the warrant requirement.

(*People v. Harris*, *supra*, 225 Cal.App.4th at p. Supp. 7.) We therefore are not persuaded by the majority's analysis in *State v. Bernard*.

## C. Conclusion and Further Observations

Because we cannot determine from the jury's verdict whether it convicted defendant of a violation of section 148 based on the legally inadequate theory that he resisted, delayed, or obstructed Officer Seel by refusing to submit to a chemical test, or instead based on one of the other three potential acts of resisting, delaying, or obstructing upon which the trial court instructed the jury, we must reverse defendant's section 148 conviction. (*People v. Perez* (2005)

18

35 Cal.4th 1219, 1233.) Because we reverse for instructional error, retrial is permitted. (See *People v. Eroshevich* (2014) 60 Cal.4th 583, 590–91; *People v. Mil* (2012) 53 Cal.4th 400, 419–20.)

At this point we find it advisable to highlight the scope and limits of our opinion. We are only concerned with the situation where the alleged violation of section 148 is a DUI arrestee's simple, peaceable refusal to give consent to a chemical test. We do not address the situation where, for example, the arrestee manifests his or her refusal by physically or violently resisting the efforts of an officer or phlebotomist to collect a blood, breath, or urine sample; nor do we address the situation where the arrestee purposefully manipulates events–say, by repeatedly vacillating between giving and refusing consent–in order to delay an eventual forced test so that his or her blood alcohol level will have declined as much as possible beforehand. In other words, we hold that the mere *fact* of refusal cannot support a section 148 conviction, not that the *manner* of refusal can never do so. Depending on the circumstances of the case, the manner of refusal or the defendant's associated conduct may very well support a lawful conviction under section 148. There will likely be some incidental delay in the officer's investigation when an arrestee declines to submit to a chemical test, such as the time it will take to secure a warrant, but the refusal is nevertheless protected conduct. What is not protected is when the refusal is not peaceable, or when the arrestee aggravates the ordinary, incidental hindrance to the investigation with the motivation to use the refusal as a delay tactic. Whether the manner of refusal constitutes a violation of section 148 is a question of fact for the jury, and when the jury is properly instructed a section 148 conviction based on the manner of refusal should be upheld so long as it is supported by substantial evidence. We have refrained from considering in the case before us whether defendant's behavior in first agreeing to a breath test before refusing any test could

19

support his conviction because that question is not before us. Instead, the path of our analysis has been compelled by the wording of the trial court's instruction to the jury. Because the jury was told that it could convict based on the mere fact of refusal, without regard for defendant's other conduct, we must reverse.

## II. *The Admission of Defendant's Post-Arrest Statements Was Not Prejudicial Miranda Error*

Defendant also urges reversal of his other two convictions, arguing that the trial court prejudicially erred by admitting a portion of the exchange between Officer Seel and him that occurred after his arrest, but without *Miranda* warnings. The People do not dispute that defendant was in custody, but argue that there was no error because defendant's post-arrest statements were not the product of police interrogation. We largely agree with the People.

"In *Miranda*, the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination prevents the prosecution from using 'statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.'" (*People v. Bejasa* (2012) 205 Cal.App.4th 26, 34.) But the *Miranda* rule only applies to statements made in response to interrogation, with interrogation "'refer[ring] not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" (*People v. Huggins* (2006) 38 Cal.4th 175, 197–98 *(Huggins)* [quoting *Rhode Island v. Innis* (1980) 446 U.S. 291, 301].)

Notably, "'"not all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response."'" (*Ibid.*) For example, "[f]ar

more is required to constitute 'the functional equivalent of questioning' than merely advising a person he is under arrest for a specific offense." (*People v. Celestine* (1992) 9 Cal.App.4th 1370, 1374.) This is because an officer telling a person that he is a crime suspect does "not call on him to confess; rather, the effect should" be "the opposite." (*Huggins*, at p. 198.) Similarly, "[a] brief statement informing an in-custody defendant about the evidence that is against him is not the functional equivalent of interrogation because it is not the type of statement likely to elicit an incriminating response." (*People v. Haley* (2004) 34 Cal.4th 283, 302 *(Haley)*.) Police statements that run afoul of *Miranda* as implied interrogation, on the other hand, "'encourage [the defendant] to make some spontaneous incriminating remark,'" perhaps by subjecting him "'to "compelling influences, [or] psychological ploys."'" (*Id.* at pp. 301–02.) Accordingly, of the specific exchanges defendant points to as being errantly and prejudicially admitted, we determine that Officer Seel's statements that he would prepare a DUI arrest report, that defendant failed to demonstrate that he was not under the influence, that defendant was giving him a hard time and being uncooperative, and so forth, cannot constitute custodial interrogation in violation of *Miranda*–rather than calling for an inculpatory statement, they naturally prompted defendant to claim innocence, protest his arrest, and ask for further information.

Furthermore, *Miranda* does not compel the exclusion of purely volunteered statements. (*Haley*, *supra*, 34 Cal.4th at p. 303.) In this category would fall defendant's unprompted pleas for leniency, such as his requests for a citation and to be given "a break," as well as his statements that he did not realize that he had run a red light, that he "didn't mean no disrespect," that he was "not trying to give [Officer Seel] a hard time," and that he had a back injury, and his inquiry into whether he was "in trouble."

However, after having reviewed the record we do detect one *Miranda*-defective statement. At one point Officer Seel appeared to ask whether defendant "talk[ed] to somebody to tell you to do all this," and defendant responded, "[n]o sir, I've just been watching videos like a fucking idiot." The most reasonable interpretation of the officer's question is that he was inquiring into whether defendant had been advised ahead of time on how to interact with police in a DUI investigation, and defendant's reply tends to show that he did indeed prepare himself in purported methods to evade responsibility for a DUI despite being guilty of the crime. However, in light of the ambiguity in the statement, as well as the other strong, ample, and undisputed evidence against defendant, we conclude that the admission of this exchange was harmless beyond a reasonable doubt. (*People v. Peracchi* (2001) 86 Cal.App.4th 353, 364 ["[w]hen a statement obtained in violation of *Miranda* is erroneously admitted into evidence, the conviction may be affirmed if the error is harmless beyond a reasonable doubt"].) Accordingly, we reject defendant's *Miranda* claim.

## DISPOSITION

Defendant's conviction on Count One for violating Penal Code section 148, subdivision (a)(1) is reversed. Defendant's convictions on Counts Two and Three are affirmed. The matter is remanded to the trial court for further proceedings not inconsistent with this opinion, which should include considering resentencing defendant in light of the reversal of Count One in the event the People do not elect to pursue retrial.