Filed 2/29/16  P. v. Knox CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E062329 |
| v. | (Super.Ct.No. FSB1300763) |
| CHRISTOPHER LEE KNOX, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Harold T. Wilson, Jr., Judge.  Affirmed with directions.

Christopher Nalls, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Arlene A. Sevidal, Andrew S. Mestman, and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I.  INTRODUCTION

A jury found defendant and appellant, Christopher Lee Knox, guilty as charged of pandering by procuring a minor 16 years of age or older (Pen. Code, § 266i, subd. (b)(1), count 1),[1] pimping a minor 16 years of age or older (§ 266h, subd. (b), count 2), and human trafficking of a minor for a sex act (§ 236.1, subd. (c)(2), count 3).  The victim of each crime was Jane Doe, a 16 year old who had previously worked as a prostitute.  The jury also found true a "use of force" enhancement in count 3.  The court found that defendant had one prior strike conviction (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)), one prior serious felony conviction (§ 667, subd. (a)(1)), and two prison priors (§ 667.5, subd. (b)), and it sentenced defendant to 36 years to life in prison.[2][3]

On this appeal, defendant makes three claims of error.  He first claims the trial court abused its discretion and structurally erred, requiring automatic reversal of his convictions, in refusing his request to discharge his privately-retained trial counsel on the second day of trial, just before jury selection was to begin.  Second, he claims the court's instructions on the use of force enhancement allegation were ambiguous and allowed the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Defendant's 36-year-to-life sentence was comprised of 30 years to life on count 3, the principal count (15 years to life, doubled to 30 years to life based on his prior strike conviction), a consecutive five-year term for his prior serious felony conviction, and a consecutive one-year term for one of his two prison priors.  Additional terms were imposed but stayed on counts 1 and 2 and on the second prison prior.

[3] The minute order and abstract of judgment erroneously imposed a consecutive one-year term for defendant's second prison prior, for a total prison sentence of 37 years to life.

jury to find the allegation true if a person other than he used force against Jane in the commission of count 3. Lastly, he claims the court miscalculated his custody credits. The People concede, and we agree, that defendant was entitled to additional custody credits. We reject defendant's other claims of error, and affirm the judgment in all other respects.

## II. FACTUAL BACKGROUND

A. *Prosecution Evidence*

Codefendant Rickiya Fulcher[4] worked as a prostitute for defendant. On February 23, 2013, Fulcher met Jane, a 16-year-old runaway, while they were both working as prostitutes on Baseline Road in San Bernardino. The next morning, Jane was standing at a bus stop when defendant and Fulcher pulled up in defendant's car. After Jane got into the car, defendant asked Jane if she had a pimp; she said she did not but was looking for one. Defendant began talking to Jane about "choosing up," and Jane offered to be defendant's prostitute. Defendant made Jane give him all of the money she had earned the previous night as a "choosing fee."

Later that day, Jane went with defendant and Fulcher to the Golden Star Inn in San Bernardino. While Fulcher was in the shower, defendant pulled out a Taser, grabbed Jane's face and told her that he wanted her "to be down for us and loyal." Fulcher later

---

[4] Fulcher was charged with pandering by procuring a minor 16 years of age or older. (§ 266i, subd. (b)(1).) Pursuant to a plea agreement, she pled guilty to placing a person for immoral purposes (§ 266e) and was sentenced to three years in prison, but she was to be resentenced to four years' probation upon the condition she testified truthfully against defendant and violated no laws.

3

told Jane defendant tased her in the past, and "he will tase you, too." Later that day, defendant bought clothes and a prepaid cell phone for Jane. He then dropped Jane and Fulcher off on Baseline Road to work.

Later that evening, around 6:00 p.m. on February 24, Jane was approached on Baseline Road by the police, who suspected her of being a prostitute. Jane admitted she was working for a pimp, and agreed to make a pretext call to defendant. On the phone, defendant instructed Jane to return to the Golden Star Inn. Jane and the police went to the motel and waited for defendant. After seeing defendant's vehicle drive past the motel, the police followed defendant to a gas station, where they arrested him. Defendant was in possession of $3,571 in cash and a cell phone. Inside defendant's vehicle, the police found a Taser matching the description Jane gave them of the Taser defendant threatened her with inside the motel room.

B. *Defense Evidence*

Defendant did not testify, but called Tera Mann, his girlfriend of 11 years, and the mother of their two children, to testify in his defense. Mann testified that she did not believe defendant was a pimp. Mann also testified that, on the day he was arrested, defendant was at Mann's mother's house with Mann, their children, defendant's mother, and his sister. Mann conceded that defendant left at around 7:00 p.m. to buy drinks for their baby. Sometime after he left to go to the store, he was arrested.

4

III.  DISCUSSION

A.  *The Trial Court Did Not Abuse Its Discretion in Denying Defendant's Motion to Replace His Retained Trial Counsel*

Defendant contends the trial court abused its discretion in denying his motion to replace his privately-retained trial counsel.  He argues the trial court, in denying his motion, improperly applied the *Marsden*[5] factors, which only apply in considering a motion to discharge appointed counsel, not retained counsel.  We conclude the trial court acted within its discretion and relied on the correct factors in denying defendant's motion.

1.  Background:  Motion Hearing to Discharge Retained Counsel

On Thursday, August 22, 2013, approximately six months after defendant's arrest, and approximately five and a half months after defendant retained trial counsel, counsel for both the People and defendant announced ready for trial.  That day, the court heard and granted the prosecution's first in limine motion, declaring Jane unavailable for purposes of trial, and allowing the parties to introduce her preliminary hearing testimony in lieu of live testimony.  Because the court was not in session on Friday, it reserved consideration of the remaining pretrial motions until Monday, August 26, 2013.

When court reconvened on Monday, August 26, 2013, defense counsel advised the court that defendant "would like to replace me, fire me as an attorney of record for him."  The trial court then stated:  "[W]hat I'm going to do is I'm going to conduct a *Marsden*

---

[5]  *People v. Marsden* (1970) 2 Cal.3d 118.

Hearing. I'm not sure if that's actually the appropriate hearing, but I am going to hear your issues. That will be done in a closed courtroom."

During the closed hearing, the court asked defendant why he wished to discharge his retained counsel. Defendant responded, "we haven't had preparation, enough time to prepare for, um, the case," "we haven't gotten discoveries on time," "I feel like that my lawyer doesn't have as much confidence in, you know, representing me to my best ability," "we haven't been able to file like motions [*sic*]," and "we haven't had enough communication throughout this time for a trial." He also expressed displeasure that "we haven't been able to get, um, any investigators towards witnesses."

The court asked defense counsel about his criminal law experience. Counsel responded that his experience included "attempted murder, Three Strikes cases, um, a million drug cases, um, burglary, um, robbery. The list goes on." Counsel also advised the court that he had been "involved in" four to five jury trials.

Defense counsel admitted that, within the past few weeks, defendant had disagreed with his "judgment calls" and that, as a result, "[w]e don't talk too much about the case anymore." He also informed the court that defendant's wish to fire him was "fifty-fifty with tactical, and just two different personalities that are not relating to each other well." Although he asserted he was still ready for trial and could "do the case, um, successfully—successfully, successfully represent him," he conceded that "if he wants a new attorney, so be it for him." Defense counsel further admitted that, at no time prior to announcing ready for trial on Thursday, August 22, 2013, did defendant indicate to trial

6

counsel that he wanted new counsel.  The court did not inquire, and neither defendant nor his trial counsel advised the trial court, whether defendant had identified or retained new trial counsel.

The trial court denied defendant's motion, noting both sides had announced ready on August 22, 2013, and the court had begun considering the People's in limine motions, without defendant informing his counsel or the court of his desire to seek new counsel.  It characterized defendant's motion as "a delay tactic" "[b]ecause it was not brought before this Court prior to or even during the motion stage of the case."  The court also noted that jury selection was to begin at 1:30 p.m. that afternoon.

2. <u>Analysis</u>

"'The right to retained counsel of choice is—subject to certain limitations— guaranteed under the Sixth Amendment to the federal Constitution.  [Citations.]  In California, this right "reflects not only a defendant's choice of a particular attorney, but also his decision to discharge an attorney whom he hired but no longer wishes to retain." [Citations.]'" (*People v. Maciel* (2013) 57 Cal.4th 482, 512.)

The right to discharge a retained attorney is "'not absolute,'" as the trial court has discretion to "'"deny such a motion if discharge will result in 'significant prejudice' to the defendant [citation], or if it is not timely, i.e., if it will result in 'disruption of the orderly processes of justice . . . .'"'" [Citations.]" (*People v. Maciel*, *supra*, 57 Cal.4th at p. 512, quoting *People v. Ortiz* (1990) 51 Cal.3d 975, 984.)  In considering such a motion, the trial court "'must exercise its discretion reasonably,'" balancing "'the

defendant's interest in new counsel against the disruption, if any, flowing from the substitution,'" and it cannot demand on "'"'a myopic insistence upon expeditiousness in the face of a justifiable request for delay . . . .'"'" (*People v. Keshishian* (2008) 162 Cal.App.4th 425, 429.)

"When a defendant makes a 'timely motion to discharge his retained attorney,'" unlike when a defendant seeks to discharge appointed counsel, "he is not required to demonstrate 'inadequate representation by his retained attorney, or to identify an irreconcilable conflict between them.' [Citations.]" (*People v. Maciel*, *supra*, 57 Cal.4th at p. 512.) Though "the erroneous denial of a motion to substitute counsel constitutes structural error and mandates reversal of the defendant's conviction without requiring a showing of prejudice[,] . . . we apply an abuse of discretion standard of review to a trial court's denial of a motion to relieve retained counsel." (*People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1411, fn. omitted.)

Defendant claims the trial court abused its discretion in denying his motion to discharge his retained counsel because it referred to the closed hearing as a "*Marsden* hearing," and erroneously applied the *Marsden* standard, rather than the *Ortiz* standard, in denying the motion. We find no abuse of discretion.

In *Maciel*, the court rejected an argument similar to the one defendant raises here. (*People v. Maciel*, *supra*, 57 Cal.4th at pp. 511-514.) The trial court in *Maciel* incorrectly referred to the defendant's motion to discharge his retained counsel as a "'*Marsden* motion,'" and, in denying the motion, pointed out that it "did not 'think'" trial

8

counsel was "'incompetent'" or had "'abandoned' defendant." (*Id*. at p. 513.) The trial court also explained, however, that bringing the motion "'on the eve, literally, of a trial date'" was not timely, particularly where the defendant could have raised the issue in prior appearances. (*Id.* at pp. 511-513.) The *Maciel* court thus concluded that the motion was property denied, and explained that: "Although a defendant seeking to discharge his retained attorney is not *required* to demonstrate inadequate representation or an irreconcilable conflict, this does not mean that the trial court cannot properly consider the absence of such circumstances in deciding whether discharging counsel would result in disruption of the orderly processes of justice." (*Id.* at p. 513.) In sum, the *Maciel* court concluded that the motion was properly denied because it would have significantly delayed the trial, and thus would have resulted in the "disruption of the orderly processes of justice." (*Ibid.*)

Contrary to defendant's assertion, the trial court here did not rely solely on the *Marsden* factors in denying defendant's motion to discharge counsel. Rather, the trial court determined defendant's motion was not timely, as he had not voiced his desire to discharge counsel prior to announcing ready for trial and before the parties had begun arguing motions in limine, and because jury selection was to begin that afternoon. The court reasonably referred to the motion as a "delay tactic," and, in denying the motion, properly focused on and properly determined that the motion was untimely because it would have unreasonably delayed the trial. Thus here, the trial court did not abuse its discretion in denying defendant's motion to discharge his retained counsel.

9

Further, the trial court's denial of defendant's last-minute attempt to discharge his counsel was not based on "'''a myopic insistence upon expeditiousness.'''" (*People v. Keshishian*, *supra*, 162 Cal.App.4th at p. 429.) Defendant was given an opportunity to explain his wish to discharge counsel, and as discussed, explained that he and his counsel did not have "enough time to prepare for, um, the case." His counsel represented, however, that he had had sufficient time to prepare the case and was ready to proceed with trial. The trial court properly denied the motion, given defense counsel's representation that he had had enough time to prepare for the trial and could "successfully represent" defendant.

Defendant maintains his motion was not a "delay tactic" and was made "not for delay's sake," but so that he could retain new counsel. He points out that his request was made only two weeks after the People amended the information to add the human trafficking charge, which increased his potential prison sentence from a six-year term to a lifetime sentence, and after the case had only been pending for six months. He also asserts the trial court did not determine whether granting his motion would result in an "unreasonable disruption." For the reasons explained, we disagree. The court's comments at the closed hearing show that it properly focused on whether the motion would unreasonably delay the trial, and whether defendant had a reasonable opportunity to replace his retained counsel before trial. And, even with the recently amended information, defense counsel represented to the court that he had had sufficient time to prepare for trial.

*People v. Turner* (1992) 7 Cal.App.4th 913 is instructive.  There, the defendant sought to discharge his trial counsel over tactical disagreements on the first day of trial, and approximately two months after trial counsel began his representation of the defendant.  (*Id.* at pp. 915-916.)  The *Turner* court concluded that the trial court did not err in denying the defendant's motion to discharge counsel on the morning of trial, as it could not have granted the motion without causing a "significant disruption."  (*Id.* at p. 919.)  Although it was disputed whether the defendant's counsel was appointed or retained, the court explained that its conclusion would be the same regardless of the distinction.  (*Id.* at pp. 918-919.)

*Keshishian* is also instructive.  There, the court concluded the trial court did not err in denying the defendant's request to discharge his retained counsel, in whom the defendant had "lost confidence," when the request was made on the day of trial, and when the defendant had not identified or retained new counsel.  (*People v. Keshishian*, *supra*, 162 Cal.App.4th at pp. 427-428.)  The court explained that the """"right to counsel cannot mean that a defendant may continually delay his day of judgment by discharging prior counsel,"' and the court is within its discretion to deny a last-minute motion for continuance to secure new counsel.  [Citations.]"  (*Id.* at p. 429.)

*People v. Lara* (2001) 86 Cal.App.4th 139, upon which defendant relies, does not support his position.  The *Lara* court concluded that the trial court abused its discretion in denying the defendant's motion to discharge his retained counsel, but unlike the trial court in *Maciel*, the *Lara* court relied solely on the *Marsden* factors in denying the

11

motion. (*People v. Lara*, *supra*, at pp. 165-166.) Specifically, the trial court in *Lara* looked only at the "breakdown in the attorney/client relationship that *Marsden* is looking at," along with the defendant's counsel's experience and abilities, and it did not consider whether granting the motion would have resulted in "significant prejudice" to the defendant, or a "disruption of the orderly processes of justice." (*Id.* at pp. 148, 155, 165-166.) In sum, the trial court did not abuse its discretion in denying the defendant's motion to discharge his attorney.

B. *The Jury Was Properly Instructed on the Use of Force Enhancement*

Defendant contends the trial court's instruction on the use of force enhancement was erroneous, because its use of the term "the offense involved" allowed the jury to find defendant guilty even if the jury determined that someone other than defendant used force in the commission of the count 3 human trafficking charge.

Section 236.1, subdivision (c) criminalizes the "human trafficking" of minors for a sex act. Section 236.1, subdivision (c)(2) provides for an enhanced penalty of 15 years to life, and a fine of up to $500,000, "when the offense involves force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person."

The parties jointly modified the human trafficking and use of force enhancement instructions. After instructing the jury on the elements of the human trafficking charge in count 3, the court instructed the jury on the use of force enhancement that: "If you find the defendant guilty of the crime charged in Count 3, or of attempting to commit that

12

crime, you must then decide whether the People have proved the additional allegation that *the offense involved* force, fear, fraud[,] deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person." (Italics added.) The court also instructed the jury that: "IT IS FURTHER ALLEGED AS TO COUNT 3, that *in the commission of the above offense, the defendant, Christopher Lee Knox*, used force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person . . . ." (Italics added.)

There is a presumption that jurors are intelligent persons and capable of understanding and correlating all jury instructions that are given. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148, overruled on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151; *People v. Anderson* (2012) 208 Cal.App.4th 851, 896.) Because of this presumption, a reviewing court considers the instructions as a whole to determine whether there is a reasonable likelihood the jury was misled. (*People v. Tate* (2010) 49 Cal.4th 635, 696.) In doing so, we independently determine whether the instructions correctly state the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Valencia* (2015) 240 Cal.App.4th Supp. 11, 17.) In determining whether the jury properly understood and applied the instructions, a commonsense understanding of the instructions, in light of all that has taken place at trial, must prevail over "'technical hairsplitting.'" (*People v. Williams* (1995) 40 Cal.App.4th 446, 457.) Errors cannot be based on verbal inaccuracies in some parts of the instructions, and they may not be

13

predicated on isolated phrases, sentences or excerpts that are open to criticism. (*People v. Kainzrants* (1996) 45 Cal.App.4th 1068, 1075.)

Considering the entire charge of the court, the use of force instruction unambiguously identified defendant as the person who was alleged to have used force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury in committing the human trafficking charge. In finding the use of force enhancement allegation true, the jury signed a verdict form for the use of force enhancement, which stated: "We the jury, in the above-entitled action find the allegation that *in the commission of the offense in Count 3, the defendant, Christopher Lee Knox*, used force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury to the victim or to another person . . . ." (Italics added.) Based on all of the instructions and evidence the jury received, there was no reasonable likelihood that the term "the offense involved" confused the jury into finding the use of force enhancement true based on someone other than defendant's use of force.

Defendant argues that it was reasonably probable that the jury misapplied the instruction to find that Fulcher's statement to Jane, i.e., that defendant had tased her, and that he would tase Jane too, satisfied the use of force enhancement. This was not evidence that Fulcher threatened Jane; rather, Fulcher merely warned Jane that defendant would use force on Jane if Jane did not make enough money, or if Jane was not "down for us and loyal." More importantly, the instructions were clear that the jury had to find

14

that defendant used force in the commission of the count 3 charge of human trafficking, before it could find the use of force enhancement allegation true.

In any event, any instructional error was harmless, even under the "beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18. The prosecution argued defendant used force when he threatened Jane with the Taser, and there was no evidence that anyone other than defendant, including Fulcher, used the Taser or any other force against Jane. Furthermore, the instructions clearly directed the jury to determine whether defendant, not Fulcher, used force, fear, fraud, deceit, coercion, violence, duress, menace, or threat of unlawful injury in committing the human trafficking charge. Thus, any ambiguity in the use of force instruction could not have contributed to the jury's true finding on the use of force enhancement. (*Id.* at p. 24.)

C. *Defendant's Custody Credits and Sentence Must Be Corrected*

The trial court awarded defendant 468 days of custody credits: 234 actual days and 234 days of conduct credit. Defendant contends, and the People agree, that the trial court miscalculated defendant's custody credits and that he is entitled to additional custody credits.[6] The trial court appears to have calculated defendant's custody credits from February 24, *2014*, to October 16, 2014, rather than from his arrest date of February 24, *2013*. The parties disagree, however, as to the number of additional days defendant

---

[6] Although a miscalculation of presentence custody credits ordinarily must be presented to the trial court before it can be the basis of an appeal (§ 1237.1), this court may review the claim if there are additional issues on appeal, and even if, as here, the complaining party failed to raise the contention to the lower court (*People v. Acosta* (1996) 48 Cal.App.4th 411, 420).

should be credited. Defendant argues that he is entitled to 1,200 days of custody credits, while the People argue defendant is entitled to 1,197 days. Defendant's calculation is correct. Additionally, as noted, the trial court sentenced defendant to a prison term of 36 years to life, but the minute order and abstract of judgment erroneously reflect defendant's sentence as 37 years to life.

The calculation of custody credits "begins on the day of arrest and continues through the day of sentencing." (*People v. Rajanayagam* (2012) 211 Cal.App.4th 42, 48; § 2900.5, subd. (a).) Additionally, for crimes "committed on or after October 1, 2011" (§ 4019, subd. (h)), "[i]t is the intent of the Legislature that if all days are earned under this section, a term of four days will be deemed to have been served for every two days spent in actual custody." (§ 4019, subd. (f); see *People v. Whitaker* (2015) 238 Cal.App.4th 1354, 1358.) Where the defendant serves an odd number of days, the actual custody credit is divided by two, rounded down to a whole number, and then multiplied by two. (*People v. Whitaker*, *supra*, at pp. 1358-1360.)

Here, defendant was arrested on February 24, 2013, and remained in custody through his sentencing date of October 16, 2014. Thus, defendant was in actual custody for, and should have been given actual credit for, a total of 600 days, not the 599 days that the People contend defendant is entitled to. Furthermore, pursuant to subdivision (f) of section 4019, defendant must be awarded 600 days of conduct credit, not 598 days, as the People claim.

16

Lastly, the trial court sentenced defendant to a prison term of 36 years to life, but both the minute order and abstract of judgment erroneously list defendant's sentence as 37 years to life based on the imposition of a second consecutive one-year sentence for his second prison prior. "Where there is a discrepancy between the oral pronouncement of judgment and the minute order or the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

Thus, the judgment must be corrected, and the abstract of judgment must be amended, to reflect 600 days of actual credit (§ 2900.5, subd. (a)) and 600 days of conduct credit (§ 4019, subd. (f)), and to accurately reflect the trial court's oral pronouncement that defendant was sentenced to a total prison term of 36 years to life.

## IV.  DISPOSITION

The case is remanded to the trial court with directions to issue a supplemental sentencing minute order and amend defendant's abstract of judgment, both reflecting that (1) defendant was entitled to, and this court awarded him, 1,200 days of custody credits—600 for actual time served and 600 for conduct credit, and (2) defendant was sentenced to 36 years to life—30 years to life on count 3, a consecutive five-year term for his prior serious felony conviction, and a consecutive one-year term for one of his two prison priors.  The trial court is further directed to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

17

RAMIREZ
P. J.

We concur:

McKINSTER
J.

MILLER
J.