Filed 3/24/17 (opinion on rehearing)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| BERNICE ESPINOZA, | |
| Plaintiff and Appellant, | E064252 |
| v. | (Super.Ct.No. CIVDS1412956) |
| JEAN SHIOMOTO, as Director, etc., | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County. Joseph R. Brisco, Judge. Affirmed.

Bartell & Hensel, Donald J. Bartell and Lara J. Gressley for Plaintiff and Appellant.

Burglin Law Offices and Paul R. Burglin as Amicus Curiae on behalf of Plaintiff and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Chris A. Knudsen, Assistant Attorney General, Gary S. Balekjian, Jennie M. Kelly, Bruce Reynolds and Brad Parr, Deputy Attorneys General, for Defendant and Respondent.

## I.

## INTRODUCTION

Bernice Espinoza appeals from the denial of her petition for writ of administrative mandate challenging the one-year suspension of her driver's license by the Department of Motor Vehicles (Department). We conclude the record supports the trial court's implied findings that (1) Espinoza was lawfully arrested on reasonable cause to believe she had been driving under the influence of alcohol (DUI), (2) Espinoza refused to submit to and failed to complete a chemical test as required under the implied consent law, and (3) Espinoza was afforded a fair hearing before the Department. Therefore, we conclude the superior court correctly denied Espinoza's petition, and we affirm the judgment.

## II.

## FACTS

### A. *Investigation and Arrest.*

At 1:40 a.m., on May 15, 2013, Sergeant Temple of the California Highway Patrol (CHP) was on routine patrol in the City of Riverside when he observed Espinoza driving a grey Hyundai and holding a cellular phone to the left side of her face. Espinoza appeared to be in the middle of a conversation, but when Espinoza saw Temple she lowered the phone from her ear. Temple activated his emergency lights, and Espinoza pulled over and stopped approximately two feet from the curb.

Temple approached and contacted Espinoza through her open driver's side window. Temple informed Espinoza that he had stopped her for talking on her phone

2

while driving and asked for her driver's license. Espinoza handed Temple her driver's license and apologized for using her cellular phone while driving. While speaking to Espinoza, Temple smelled a strong odor of an alcoholic beverage emitting from the interior of Espinoza's vehicle. Temple asked Espinoza where she was coming from, and Espinoza responded she had been at a local bar. When Temple asked Espinoza if she had been drinking, Espinoza said she drank one cocktail but had not had anything else to drink for two hours. Espinoza's speech appeared to be normal.

Temple asked Espinoza to step out of her vehicle, but Espinoza declined to cooperate. Espinoza informed Temple that she was a public defender; that she did not wish to perform any field sobriety tests or to step out of her vehicle; and citing *McNeely*,[1] a recently decided United States Supreme Court case, Espinoza said she would not submit to a blood test. When Temple again asked Espinoza to step out of her vehicle, Espinoza once again declined. Espinoza asked Temple to issue her a citation for the cellular phone violation (see Veh. Code,[2] § 23123, subd. (a)), and said she would call a friend to come pick her up and take her home.

As Temple requested an additional officer to respond and conduct a DUI investigation,[3] Espinoza stepped out of her vehicle. Espinoza again informed Temple

---

[1] *Missouri v. McNeely* (2013) 569 U.S. ___ [133 S.Ct. 1552] (*McNeely*).

[2] All additional undesignated statutory references are to the Vehicle Code.

[3] Temple testified he was a patrol supervisor in the Riverside area. If Temple was to stop a motorist who exhibits signs of intoxication, he would routinely call for a deputy

*[footnote continued on next page]*

that she would not perform any field sobriety tests.  While standing on the sidewalk, Espinoza crossed her legs, lost her balance, and stumbled a bit.  As Espinoza spoke, Temple smelled a strong odor of an alcoholic beverage on Espinoza's breath.  Temple also saw that Espinoza's eyes were red.

Officer Gonzalez of the CHP then arrived on the scene.  Temple told Gonzalez what he had observed, identified Espinoza, and directed Gonzalez to conduct a DUI investigation.  When Gonzalez walked up to Espinoza, he immediately smelled a strong odor of an alcoholic beverage on Espinoza's person and on her breath.  Gonzalez also saw that Espinoza had red, bloodshot, and watery eyes.  Espinoza was standing normally, and she was not swaying or moving about.  Gonzalez asked Espinoza if she had been drinking, and Espinoza replied she had a drink two hours earlier.  Espinoza then told Gonzalez that she was a Riverside County public defender and knew her rights; that she did not want to have any problems with her work; that Gonzalez should not ask her any field sobriety questions because she would not answer them and would not perform any field sobriety tests; and again cited *McNeely*.

As she did with Temple, Espinoza asked that Gonzalez issue her a citation for the cellular phone violation and said she would have a friend come and pick her up.

*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
to come to the scene and conduct a DUI investigation so he would be free to respond to calls from other deputies that require a supervisor.

Espinoza began to look at her cellular phone, and she fumbled and dropped her keys. As she spoke, Espinoza repeated herself several times within a short period of time that she would rather be issued a citation and have a friend come pick her up. Espinoza did not slur her speech and she was coherent, but she was crying and very emotional the whole time Gonzalez spoke to her. Gonzalez did not detect any mental impairment while talking to Espinoza. Gonzalez asked Espinoza to cooperate or he would arrest her for DUI based on his and Temple's observations. Espinoza refused to cooperate and said she could call a supervisor from her office to come pick her up.

Based on his own observations of Espinoza and based on Temple's observations, Gonzalez concluded Espinoza had been driving while under the influence of alcohol and placed her under arrest. Espinoza became emotional and upset. Gonzalez admonished Espinoza pursuant to the implied consent law that she had to submit to a blood or breath test. Espinoza told Gonzalez she would take a blood test "pursuant to *McNeely*." Gonzalez told Espinoza that her refusal to submit to a chemical test would result in her license being suspended for one year. Gonzalez then transported Espinoza to the county jail.

At the jail, Espinoza refused to submit to a chemical test. Using a DS 367 form ("AGE 21 AND OLDER OFFICER'S STATEMENT"), Gonzalez advised Espinoza that: (1) she was suspected of driving under the influence of alcohol and, therefore, had the right to choose a blood or breath test; (2) refusal to submit to or failure to complete a blood or breath test would result in her license being suspended for one year or revoked for two or three years; (3) refusal to submit to or failure to complete a blood or breath test

5

could be used against her in court and would result in a fine and imprisonment if she was convicted of DUI; (4) she did not have the right to have an attorney present when deciding whether to submit to a chemical test and when choosing which test; and (5) if she was incapable of completing one of the two test options, she had to submit to the other.

Espinoza told Gonzalez she would submit to a blood test, but only if the officer obtained a "subpoena," "pursuant to *McNeely*" from the on-duty judge, compelling her to submit to a blood test. Gonzalez understood Espinoza to mean she would submit to a blood test if he first got a warrant. Gonzalez told Espinoza that her willingness to submit to a blood test with a warrant would be treated as a refusal. Gonzalez also told Espinoza that, after the decision in *McNeely*, the policy of the CHP was to obtain warrants for forced blood draws only in felony DUI cases,[4] and that no warrant would be requested in Espinoza's case. No warrant was obtained, so no blood test was taken. In addition, Espinoza did not submit to a breath test. Espinoza was then booked into jail on suspicion of DUI. Gonzalez personally served Espinoza with notice that her driver's license was suspended or revoked, and forwarded the DS 367 form and his DUI investigation report to the Department.

B. *Administrative Per Se Hearing.*

---

[4] Gonzalez did not specify whether the policy of only obtaining warrants for forced blood draws in felony DUI cases was adopted by the CHP statewide or was merely a decision made by CHP officials locally to govern the geographic area including Riverside.

6

Espinoza requested an administrative hearing to review the order suspending her driver's license, during which Temple and Gonzalez testified to the facts just stated. Espinoza introduced the expert testimony of Felix D'Amico, a retired sheriff's sergeant and drug recognition expert. D'Amico testified he reviewed the reports prepared by the arresting officer and the mobile video audio recording (MVAR) taken from Gonzalez's police vehicle.

D'Amico testified he observed no "bad driving" on Espinoza's part, although she was talking on a cellular phone, and that Espinoza had no problem getting out of her vehicle and walking to the curb. Contrary to Temple's account, D'Amico testified that after viewing the MVAR, he concluded Espinoza parked no more than 12 inches from the curb when she was stopped, and there was nothing wrong with the way she parked. D'Amico testified Espinoza did not slur her speech, she had no problem answering the officers' questions, and she was coherent. With regard to Gonzalez's testimony that he observed no mental impairment, D'Amico testified a person cannot be under the influence of alcohol if he or she is not mentally impaired. D'Amico testified he observed no mental impairment because Espinoza had no problem answering the officers' questions and, although she refused to submit to any tests, she did not argue with or show animosity toward the officers. D'Amico also testified that Espinoza was standing straight, she was not swaying, she did not have an unsteady gait, and she did not fall down.

D'Amico testified bloodshot eyes do not necessarily indicate a person is under the influence of alcohol because there are many reasons why a person's eyes may become

7

bloodshot. D'Amico testified odor of an alcoholic beverage on a person's breath merely indicates the person had alcohol in his or her mouth at some point and does not indicate the person actually swallowed the alcohol. D'Amico opined that Espinoza was not under the influence of alcohol and, therefore, Officer Gonzalez did not have probable cause to lawfully place Espinoza under arrest.

The hearing officer examined D'Amico. D'Amico testified that if a person merely puts alcohol in his or her mouth but does not swallow it, the alcohol will dissipate entirely in about 20 minutes. If Espinoza had merely placed alcohol in her mouth but had not swallowed it, the alcohol would have dissipated during the stop and investigation.

In her notification of findings and decision, the hearing officer sustained the one-year suspension of Espinoza's driver's license. The hearing officer found: (1) Gonzalez had reasonable cause to believe Espinoza drove under the influence of alcohol; (2) Espinoza was lawfully arrested; (3) Espinoza was told her driver's license would be suspended or revoked if she refused to submit to or failed to complete a chemical test; and (4) Espinoza refused to submit to or failed to complete a chemical test.

In her findings of fact, the hearing officer concluded Officer Gonzalez had probable cause to lawfully arrest Espinoza for DUI based on the objective symptoms of bloodshot and watery eyes and the odor of an alcoholic beverage, and based on the additional facts that Espinoza refused to perform field sobriety tests and admitted to consuming alcohol. The hearing officer also concluded Gonzalez correctly admonished Espinoza under the implied consent law that her license would be suspended or revoked if she refused to submit to or failed to complete a chemical test. With respect to

8

Espinoza's refusal to submit to a chemical test, the hearing officer concluded Espinoza's conditional submission under *McNeely* was a refusal. The hearing officer concluded *McNeely* only applies to forced blood draws, and Gonzalez did not request a forced blood draw. In addition, the hearing officer concluded Espinoza "adamantly refused all other test[s]." The hearing officer found that Temple and Gonzalez were credible witnesses, and found D'Amico's testimony to be biased and entitled to little weight.

III.

PROCEEDINGS IN THE SUPERIOR COURT

After being served with the Department's administrative per se findings and decision, Espinoza filed a petition for writ of review and administrative mandamus in the superior court challenging the hearing officer's decision. In her points and authorities in support of the petition, Espinoza argued: (1) she was not lawfully arrested because Gonzalez lacked reasonable cause to believe she was under the influence of alcohol; (2) she had a right under *McNeely* to force the police to obtain a warrant before they drew her blood and, therefore, her conditional consent to a blood test did not amount to a refusal; and (3) the hearing officer's complete disregard of D'Amico's expert testimony and a number of errors on the face of the hearing officer's decision showed the decision was not made in accordance with due process. The Department filed an answer and opposition to the petition.

At the hearing on Espinoza's petition, the superior court stated its tentative decision was to deny the petition. Espinoza's counsel argued that Espinoza had met her burden of showing the administrative decision was contrary to the weight of the evidence

9

because it contained numerous factual errors. Counsel also argued the administrative hearing was a "farce" because the hearing officer completely disregarded Espinoza's expert witness for no good reason. The court took the matter under submission after hearing argument from the Department.

The court subsequently entered an order denying the petition. Neither party requested a statement of decision (Code Civ. Proc., § 632), so the trial court did not issue written findings. Thereafter, the trial court entered a judgment in favor of the Department and against Espinoza. The judgment dissolved the stay on Espinoza's license suspension and awarded the Department its costs. The Attorney General served Espinoza with a notice of entry of the judgment, and Espinoza timely appealed.

IV.

DISCUSSION

A.    *Applicable Law.*

As pertinent here, the implied consent law provides that drivers who are arrested on suspicion of DUI are deemed to have consented to chemical testing to determine their blood-alcohol concentration (BAC). (§ 23612, subd. (a)(1)(A); *Troppman v. Valverde* (2007) 40 Cal.4th 1121, 1129-1130.)[5] Testing for BAC is incidental to a lawful arrest for DUI and at the direction of the peace officer having reasonable cause to believe the motorist drove under the influence of alcohol in violation of section 23152 or 23153.

---

[5] Section 13384, subdivisions (a) and (b), requires a motorist to consent in writing to submit to chemical testing or to a preliminary alcohol screening test, when requested by a peace officer, as a condition of obtaining or renewing a California driver's license.

10

(§ 23612, subd. (a)(1)(C).) The motorist must be admonished that failure to submit to or failure to complete a chemical test will result in a fine, mandatory imprisonment if the motorist is subsequently convicted of DUI under sections 23152 or 23153, and suspension of his or her driver's license. (§ 23612, subd. (a)(1)(D).) A motorist arrested for driving under the influence of alcohol "has the choice of whether the test shall be of his or her blood or breath and the officer shall advise the person that he or she has that choice. If the person arrested either is incapable, or states that he or she is incapable, of completing the chosen test, the person shall submit to the remaining test." (*Id*. subd. (a)(2)(A).) If both blood and breath tests are unavailable, the motorist must submit to a urine test. (*Id*. subds. (a)(1)(A), (a)(2)(A), & (d)(2).)

The administrative per se procedure is the means by which the Department suspends or revokes a motorist's driver's license for driving under the influence or for refusing to submit to a chemical test under the implied consent law. "The procedure is called 'administrative per se' because it does not impose criminal penalties, but simply suspends a person's driver's license as an administrative matter upon a showing the person was arrested for driving with a certain blood-alcohol concentration, without additional evidence of impairment. [Citation.] The express legislative purposes of the administrative suspension procedure are: (1) to provide safety to persons using the highways by quickly suspending the driving privilege of persons who drive with excessive blood-alcohol levels; (2) to guard against erroneous deprivation by providing a prompt administrative review of the suspension; and (3) to place no restriction on the

11

ability of a prosecutor to pursue related criminal actions. [Citations.]" (*MacDonald v. Gutierrez* (2004) 32 Cal.4th 150, 155.)

"The administrative per se laws were deemed necessary due to the time lag that often occurs between an arrest and a conviction for driving while intoxicated or with a prohibited blood-alcohol concentration. During this interim period, arrestees who would eventually be convicted of an intoxication-related driving offense were permitted to continue driving and, possibly, endangering the public. Moreover, without administrative per se laws, persons with extremely high blood-alcohol concentration levels at the time of arrest could escape license suspension or revocation by plea bargaining to lesser crimes or entering pretrial diversion. Thus, by providing for an administrative license suspension prior to the criminal proceeding, the law affords the public added protection. [Citation.]" (*MacDonald v. Gutierrez*, *supra*, 32 Cal.4th at p. 155.)

If a motorist who is arrested for DUI refuses to submit to a chemical test or fails to complete one, the arresting officer must personally serve the motorist with notice of an order of suspension or revocation of the motorist's privilege to operate a motor vehicle and issue the motorist a 30-day temporary driver's license. (§§ 13353, subd. (c), 23612, subds. (e), (f).) The officer must take possession of the motorist's California driver's license and immediately forward to the Department a copy of the completed notice of suspension or revocation and the driver's license taken from the motorist. (§ 23612, subds. (f), (g)(1).) Upon receipt of the notice of suspension or revocation and the officer's sworn statement that the officer had reasonable cause to believe the motorist drove under the influence of alcohol in violation of sections 23152 or 23153, the

12

Department shall suspend the motorist's driver's license for one year or revoke the motorist's driver's license for two or three years if the motorist falls within certain DUI recidivist statutes. (§ 13353, subd. (a)(1)-(3).)

The Department must also conduct a review of the record, including the officer's sworn statement, to determine whether the following facts are true: (1) the officer had reasonable cause to believe the motorist drove under the influence of alcohol in violation of sections 23152 or 23153; (2) the motorist was lawfully detained; (3) the motorist refused to submit to or failed to complete a chemical test after being requested by a peace officer; and (4) the motorist was admonished that his or her driving privilege would be suspended or revoked if he or she refused to submit to or failed to complete a chemical test. (§§ 13353, subd. (d), 13557, subds. (a), (b)(1).) If the Department concludes those facts to be true by a preponderance of the evidence, it shall sustain the license suspension or revocation. (§ 13557, subd. (b)(1).)

Before or after receiving the results of the administrative review, the motorist may request an administrative hearing. (Veh. Code, §§ 13557, subd. (e), 13558, subd. (a).) The only issues to be determined at the administrative hearing are the same four facts at issue in the Department's internal review. (Veh. Code, §§ 13557, subd. (b)(1)(A)-(D), 13558, subd. (c)(1).) If the Department again sustains the license suspension or revocation, the motorist's 30-day temporary driver's license shall be revoked and the suspension or revocation shall become effective five days after the Department gives notice to the motorist. (Veh. Code, § 13558, subd. (f).) Finally, the Department must inform the motorist of his or her right to petition the superior court to review the

13

administrative decision.  (Veh. Code, §§ 13558, subd. (f), 13559; see Code Civ. Proc., § 1094.5.)

"When a person petitions for a writ of mandate following an order suspending his or her driver's license, the court is required to determine, based on the exercise of its independent judgment, whether the weight of the evidence supports the administrative decision.  [Citations.]  In making that determination, the court acts as a trier of fact; it has the power and responsibility to weigh the evidence and make its own determination about the credibility of witnesses.  [Citation.]  The administrative findings, however, are entitled to 'a strong presumption of correctness,' and 'the party challenging the administrative decision bears the burden of convincing the court that the administrative findings are contrary to the weight of the evidence.'  [Citation.]"  (*Arthur v. Department of Motor Vehicles* (2010) 184 Cal.App.4th 1199, 1204-1205 (*Arthur*).)

"On appeal, we review the record to determine whether the court's findings are supported by substantial evidence.  ""'We must resolve all evidentiary conflicts and draw all legitimate and reasonable inferences in favor of the trial court's decision.  [Citations.]  Where the evidence supports more than one inference, we may not substitute our deductions for the trial court's.  [Citation.]  We may overturn the trial court's factual findings only if the evidence before the trial court is insufficient as a matter of law to sustain those findings.  [Citations.]'"""  (*Arthur*, *supra*, 184 Cal.App.4th at p. 1205.)

"An appealed judgment is presumed to be correct.  We will indulge all intendments and presumptions to support the judgment on matters as to which the record is silent and prejudicial error must be affirmatively shown.  [Citations.]"  (*Shaw v.*

14

*County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267.) In this case, neither party requested a statement of decision under Code of Civil Procedure section 632, and the trial court issued no written findings. The doctrine of implied findings "requires . . . an appellate court [to] presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record. In other words, the necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence. [Citations.]" (*Shaw v. County of Santa Cruz*, at pp. 267-268, fn. omitted; accord, *Lee v. Department of Motor Vehicles* (1983) 142 Cal.App.3d 275, 284; 2 Cal. Administrative Mandamus (Cont.Ed.Bar 3d ed. 2016) Procedures After Trial, § 15.3, pp. 15-3 to 15-4.)

Finally, "we will affirm a judgment correct on any legal basis, even if that basis was not invoked by the trial court. [Citation.] There can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct. [Citation.]" (*Shaw v. County of Santa Cruz*, *supra*, 170 Cal.App.4th at p. 269.)

B.     *The Administrative Record Supports the Superior Court's Implied Findings.*

As noted, *ante*, a motorist's driver's license may be suspended or revoked only if: (1) the officer had reasonable cause to believe the motorist drove under the influence of alcohol in violation of sections 23152 or 23153; (2) the motorist was lawfully detained; (3) the motorist refused to submit to or failed to complete a chemical test after being requested by a peace officer, and (4) the motorist was admonished that his or her driving privilege would be suspended or revoked if he or she refused to submit to or failed to

15

complete a chemical test. (§§ 13557, subd. (b)(1), 13558, subd. (c)(1).) By denying Espinoza's petition, the trial court impliedly found those facts to be true. Espinoza only challenges the trial court's implied findings that the arresting officer had reasonable cause to believe she drove under the influence of alcohol, and that Espinoza refused to submit to a chemical test. We conclude the record contains substantial evidence to support both findings.

### 1. Espinoza Was Lawfully Arrested.

Espinoza argues she was not lawfully arrested for purposes of the administrative per se scheme because the arresting officer lacked reasonable cause to believe Espinoza drove while under the influence of alcohol. We conclude otherwise.

"'Probable cause exists when the facts known to the arresting officer would persuade someone of "reasonable caution" that the person to be arrested has committed a crime. (*Dunaway v. New York* (1979) 442 U.S. 200, 208, fn. 9 . . . .) "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts . . . ." (*Illinois v. Gates* (1983) 462 U.S. 213, 232 . . . .) It is incapable of precise definition. (*Maryland v. Pringle* (2003) 540 U.S. 366, 371 . . . .) "'The substance of all the definitions of probable cause is a reasonable ground for belief of guilt,'" and that belief must be "particularized with respect to the person to be . . . seized." (*Ibid.*)'" (*People v. Scott* (2011) 52 Cal.4th 452, 474, quoting *People v. Celis* (2004) 33 Cal.4th 667, 673.)

Similarly, reasonable cause is ""'"defined as that state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and

16

strong suspicion that the person is guilty of a crime."' [Citations.]" (*People v. Adair* (2003) 29 Cal.4th 895, 904; accord, *Cantrell v. Zolin* (1994) 23 Cal.App.4th 128, 133.)

Espinoza was arrested on suspicion of driving under the influence of alcohol in violation of section 23152. "'To be "under the influence" within the meaning of the Vehicle Code, the liquor or liquor and drug(s) must have so far affected the nervous system, the brain, or muscles as to impair to an appreciable degree the ability to operate a vehicle in a manner like that of an ordinarily prudent and cautious person in full possession of his faculties. [Citations.]'" (*People v. McNeal* (2009) 46 Cal.4th 1183, 1192-1193.) "[E]vidence of actual impairment may include the driver's appearance, an odor of alcohol, slurred speech, impaired motor skills, slowed or erratic mental processing, and impaired memory or judgment. Conversely, absence of these manifestations may indicate that the driver was not impaired." (*Id*. at p. 1198.)

In addition to erratic driving and objective symptoms of intoxication, an investigating officer may also properly consider the motorist's refusal to step out of their vehicle and refusal to submit to field sobriety tests when determining whether there is probable cause to arrest for DUI. (See *Kinlin v. Kline* (6th Cir. 2014) 749 F.3d 573, 580-581; *Wilder v. Turner* (10th Cir. 2007) 490 F.3d 810, 814-815; *Miller v. Harget* (11th Cir. 2006) 458 F.3d 1251, 1260; *Byrnes v. City of Manchester* (D.N.H. 2012)

848 F.Supp.2d 146, 162-163; *Marvin v. Department of Motor Vehicles* (1984) 161 Cal.App.3d 717, 719-720 (*Marvin*).)[6]

We conclude the record contains substantial evidence to support the superior court's implied finding that a reasonable officer would conclude there was probable or reasonable cause to arrest Espinoza for DUI. Espinoza exhibited some of the classic, objective symptoms of intoxication, including having red, bloodshot, and watery eyes, and having a strong odor of an alcoholic beverage on her breath. Based on a strong odor of alcohol on Espinoza's breath (detectable in the open air during the entire investigation and not just inside the passenger compartment to Espinoza's vehicle), the officers were not required to believe Espinoza when she said she had not had a drink for two hours. (See *People v. Ortiz* (1969) 276 Cal.App.2d 1, 6 ["If the police officers were required to believe every exculpatory story made by a suspect at the time of his [or her] arrest there would be very few arrests."].) Although Espinoza appeared to be standing straight and did not slur her words, she stumbled when standing on the sidewalk and she fumbled and dropped her keys. Espinoza was emotional and cried the entire time she spoke to Gonzalez, and she repeated herself numerous times. In addition, when Espinoza pulled over, she parked approximately two feet away from the curb.

---

[6] The lower federal court opinions cited in the text arose from civil rights lawsuits under title 42 United States Code section 1983, in which motorists alleged they were falsely arrested without probable cause to believe they were guilty of DUI, in violation of their rights under the Fourth Amendment to be free from unreasonable searches and seizures. (E.g., *Kinlin v. Kline*, *supra*, 749 F.3d at p. 575.) The same Fourth Amendment probable cause standard applies in civil cases arising from an arrest or seizure. (See *Luchtel v. Hagemann* (9th Cir. 2010) 623 F.3d 975, 979.)

18

Espinoza's initial refusal to get out of her vehicle, her complete refusal to answer field sobriety questions or to perform field sobriety tests, and her repeated requests to be let off with a citation, were additional factors a reasonable officer could properly consider when determining whether there was probable cause to believe Espinoza drove while under the influence of alcohol. Viewing these facts in their totality, we conclude substantial evidence supports the superior court's implied finding that Espinoza was lawfully arrested based on probable cause of DUI.

In arguing Gonzalez did not have probable cause to arrest her, Espinoza places much weight on Gonzalez's testimony that, when he spoke to Espinoza, he observed no mental impairment. That Espinoza appeared coherent and had no problems communicating with Gonzalez was certainly some evidence that Espinoza was not under the influence. But because we find substantial evidence to support probable cause to arrest Espinoza for DUI, we must affirm the trial court's implied finding. (*Arthur*, *supra*, 184 Cal.App.4th at p. 1205.)

Finally, Espinoza points to Gonzalez's testimony that he treated Espinoza's refusal to answer field sobriety questions or to submit to field sobriety tests as consciousness of guilt, and she argues that was the real reason Gonzalez arrested her. Gonzalez's subjective reasons for arresting Espinoza are irrelevant. When determining whether there was probable cause for an arrest and, therefore, that the arrest was lawful, the sole question is whether a *reasonable officer* in the same position would *objectively* conclude there was probable cause to arrest. (*Maryland v. Pringle* (2003) 540 U.S. 366, 371; *Whren v. United States* (1996) 517 U.S. 806, 813.) In any event, the courts have held that

19

refusal to submit to field sobriety tests *is* properly treated as evidence of consciousness of guilt.  (*Marvin*, *supra*, 161 Cal.App.3d at p. 720 [investigating officer reasonably interpreted a strong odor of alcohol and refusal to submit to a field sobriety tests as a consciousness of guilt]; see *People v. Jackson* (2010) 189 Cal.App.4th 1461, 1466-1469 [refusal to take standard field sobriety tests, as opposed to a refusal to submit to preliminary alcohol screening breath test, is admissible evidence of consciousness of guilt].)  Viewing the same facts as Gonzalez, a reasonable officer would conclude there was probable cause to arrest Espinoza for DUI.

> 2. Espinoza's Purported Consent to Submit to a Chemical Test Constituted a Refusal to Submit.

Espinoza argues she did not refuse to submit to a chemical test.  Instead, she argues she had a right under *McNeely* to force the police to obtain a warrant before they could seize her blood for testing and, therefore, her standing on her rights did not constitute a refusal to submit to a chemical test under sections 13353, subdivision (c), and 23612, subdivisions (e) and (f).  Although Espinoza had a constitutional right to be free from a warrantless, *coerced* search of her blood incident to her lawful arrest, she had no such right with respect to a breath test.  When Espinoza was told the policy of the CHP was to obtain warrants for forced blood draws only in felony DUI cases, and that a warrant would not be obtained in her case, Espinoza was required to choose a breath test.  Espinoza's purported consent to a blood draw, to the exclusion of a breath test, constituted refusal to submit to a chemical test.

20

a.    *Purported consent to a chemical test is normally treated*

*as a refusal.*

"'The question whether a driver "refused" a test within the meaning of [section 23612] is a question of fact.  [Citation.]'  [Citation.]  To comply with the law, a 'driver should clearly and unambiguously manifest the consent required by the law.  Consent which is not clear and unambiguous may be deemed a refusal.'  [Citation.]  'In determining whether an arrested driver's conduct amounts to a refusal to submit to a test, the court looks not to the state of mind of the arrested driver, but to "the fair meaning to be given [the driver's] response to the demand he [or she] submit to a chemical test." [Citations.]'"  (*Garcia v. Department of Motor Vehicles* (2010) 185 Cal.App.4th 73, 82-83 (*Garcia*).)

It is well settled that "[a] conditional consent to a chemical test constitutes a refusal to submit within the meaning of section 13353."  (*Payne v. Department of Motor Vehicles* (1991) 235 Cal.App.3d 1514, 1518, citing *Webb v. Miller* (1986) 187 Cal.App.3d 619, 626, *Cole v. Department of Motor Vehicles* (1983) 139 Cal.App.3d 870, 873, & *Fallis v. Dept. of Motor Vehicles* (1968) 264 Cal.App.2d 373, 382; accord, *Kesler v. Department of Motor Vehicles* (1969) 1 Cal.3d 74, 77 ["respondent's insistence upon taking all three [chemical] tests rather than only one constituted, at best, a conditional consent to a test which, under the authorities, must be deemed to be a refusal to submit to a test within the meaning of section 13353"]; *Carrey v. Department of Motor Vehicles* (1986) 183 Cal.App.3d 1265, 1270-1271 ["A qualified or conditional consent is a

21

refusal."].)[7]  Furthermore, a motorist who refuses a chemical test but nonetheless submits to a test "under protest" but without offering physical resistance will be deemed to have refused to submit.  (*Payne v. Department of Motor Vehicles*, at p. 1518, citing *Barrie v. Alexis* (1984) 151 Cal.App.3d 1157, 1161-1162.)

Espinoza relies on *Ross v. Department of Motor Vehicles* (1990) 219 Cal.App.3d 398 (*Ross*) for the proposition "that where a condition is imposed by law, and invoked by an arrestee, such an invocation does not amount to a refusal to take a chemical test."  In *Ross*, the motorist chose a blood test but the technician who arrived to draw his blood was disheveled.  The motorist asked to see the technician's identification.  When the arresting officer responded the technician was not required to comply with the motorist's request, the motorist refused to take the blood test unless the technician first showed his identification.  (*Id*. at p. 400.)  The motorist's request to see the technician's identification was deemed to be a refusal to submit to a chemical test, and his license was suspended under section 13353.  (*Ibid*.)

---

[7] We note that in the context of chemical testing under an implied consent law, the concept of "conditional consent" is a misnomer.  If consent to submit to a chemical test must be clear and unambiguous, and failure to clearly and unambiguously manifest consent constitutes a refusal to submit to a chemical test (*Garcia*, *supra*, 185 Cal.App.4th at p. 82), it follows that placing conditions on submission to a chemical test demonstrates a lack of consent.  (See, e.g., *Cash v. Commonwealth* (Va. 1996) 466 S.E.2d 736, 738 ["The consent to submit to a blood or breath test, granted when a person operates a motor vehicle upon the highways, 'is not a qualified consent and it is not a conditional consent, and therefore there can be no qualified refusal or conditional refusal to take the test.' [Citation.]"].)  Therefore, although "conditional consent" has become somewhat of a term of art in these types of cases, we will use the more precise phrase "purported consent" in this opinion.

The Court of Appeal in *Ross* distinguished cases finding conditional consent to be a refusal. "[O]ur facts do not involve a condition *imposed by the arrestee*, unrelated to a statutory right. The Legislature has specifically provided an arrestee is entitled to have blood drawn by *only* licensed, qualified individuals in a medically approved manner. [Citations.] Therefore, the condition is one *imposed by statute* and merely invoked by the arrestee." (*Ross*, *supra*, 219 Cal.App.3d at p. 402.) Because the motorist's concern was related to enforcing his right to have his blood drawn by a licensed, qualified technician, and was not merely a "procedural deficiency," the Court of Appeal concluded the motorist's request was not a refusal and reversed the license suspension. (*Id*. at pp. 402-403.)

*Ross* is distinguishable from our case. There, after being advised of his duties under the implied consent law, Ross chose to submit to a blood test. (*Ross*, *supra*, 219 Cal.App.3d at p. 400.) In other words, Ross actually consented to a blood test. It was only *after* the blood technician arrived in a disheveled state that Ross demanded the technician produce his identification. (*Ibid*.) Here, Espinoza purported to consent to a blood test, but she conditioned that consent on the officer obtaining a warrant. That did not constitute clear and unequivocal consent to a chemical test and, therefore, was not actual consent. (*Garcia*, *supra*, 185 Cal.App.4th at p. 82.) Moreover, *Ross* has been limited to its facts. "*Ross* held only that an arrestee must be given assurance of the qualifications of the individual drawing blood if hesitation is expressed." (*Payne v. Department of Motor Vehicles*, *supra*, 235 Cal.App.3d at p. 1519.) We have found no published decision applying *Ross* to a motorist's purported consent to a chemical test on

23

the condition that the officer first obtain a search warrant. As explained, *infra*, we conclude Espinoza refused to submit to a chemical test.

b. *A motorist who is lawfully arrested for DUI has the right under the Fourth Amendment to refuse to submit to a warrantless, coerced blood test, but has no right to refuse to submit to a warrantless breath test.*

"In *Schmerber* [*v. California* (1966) 384 U.S. 757 (*Schmerber*)], the defendant was taken to the hospital following an automobile accident and, against his express refusal on the advice of counsel, the police directed a physician to draw defendant's blood to be tested for the presence of alcohol. (*Schmerber*, *supra*, 384 U.S. at pp. 758-759.) Among other things, the United States Supreme Court in *Schmerber* addressed whether the warrantless blood test violated the Fourth Amendment. The high court concluded that 'compulsory administration of a blood test' was a search under the Fourth Amendment. (384 U.S. at p. 767.) Although 'there was plainly probable cause . . .' to arrest the defendant on suspicion of DUI, the court found that the search could not be justified as a search incident to arrest because the cases articulating that exception to the warrant requirement 'have little applicability with respect to searches involving intrusions beyond the body's surface.' (*Id*. at pp. 768–769.)

"The court in *Schmerber* noted that '[s]earch warrants are ordinarily required for searches of dwellings, and, absent an emergency, no less could be required where intrusions into the human body are concerned.' (*Schmerber*, *supra*, 384 U.S. at p. 770.) However, the court concluded that the arresting officer 'might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a

24

warrant, under the circumstances, threatened "the destruction of evidence," [citation].'
(*Ibid*.)  The high court acknowledged 'that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system,' and because the defendant had to be rushed to the hospital and the officers had to investigate the accident scene, it concluded 'there was no time to seek out a magistrate and secure a warrant.'  (*Id*. at pp. 770, 771.)  Under those 'special facts,' the court held that the warrantless search was justified.  (*Id*. at p. 771.)"  (*People v. Harris* (2015) 234 Cal.App.4th 671, 683 (*Harris*).)

As this court noted in *Harris*, for just over 40 years, California courts have interpreted *Schmerber v. California* (1966) 384 U.S. 757 to permit forced, warrantless blood draws of motorists arrested on suspicion of DUI without any additional showing of exigent circumstances.  (*Harris*, *supra*, 234 Cal.App.4th at pp. 702-704.)  Without question, *McNeely* repudiated that long-standing interpretation.[8]  (*Harris*, at p. 703.)

"[I]n *McNeely*, the defendant refused to take a Breathalyzer test during a DUI investigation and again when being transported to the police station, in order to measure his blood-alcohol concentration (BAC), so the arresting officer transported the defendant to a nearby hospital.  (*McNeely*, *supra*, 569 U.S. at pp. ___ [133 S.Ct. at pp. 1556-1557].)  At the hospital, the arresting officer read an admonition to the defendant under the

---

[8]  The question before this court in *Harris* was whether a motorist's freely and voluntarily given consent to a blood draw, after being admonished pursuant to the implied consent law, constituted actual consent under the Fourth Amendment.  (*Harris*, *supra*, 234 Cal.App.4th at p. 686.)  We concluded freely and voluntarily given consent to a warrantless blood draw satisfies the Fourth Amendment, and that Harris actually consented to have his blood drawn.  (*Harris*, at pp. 686-692.)

Missouri implied consent law, and 'explained to [the defendant] that under state law refusal to submit voluntarily to the test would lead to the immediate revocation of his driver's license . . . and [his refusal] could be used against him in a future prosecution. [Citation.]' (569 U.S. at p. ___ [133 S.Ct. at p. 1557].) The defendant refused to submit to [a] blood test so the arresting officer directed a laboratory technician to draw a blood sample. (*Id*. at p. ___ [133 S.Ct. at p. 1557].) The United States Supreme Court granted certiorari in *McNeely* to resolve a split in authority on the question of 'whether the natural metabolization of alcohol in the bloodstream presents a *per se* exigency that justifies an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases.' (*Id*. at pp. ___, ___ [133 S.Ct. at pp. 1556, 1558].)

"The majority in *McNeely* held that the natural dissipation of alcohol in the bloodstream does not create exigent circumstances in every DUI case. (*McNeely*, *supra*, 569 U.S. at pp. ___, ___ [133 S.Ct. at pp. 1563, 1568] (maj. opn. of Sotomayor, J.).) 'In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so. [Citation.]' (*Id*. at p. ___ [133 S.Ct. at p. 1561].) Although the court had no 'doubt that some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test,' the high court held that the state was required to make such a showing under the totality of the circumstances and on a case-by-case basis. (*Id*. at

26

pp. ___, ___ [133 S.Ct. at pp. 1561, 1563].)" (*Harris*, *supra*, 234 Cal.App.4th at pp. 683-684.)

After briefing was completed in this case, the United States Supreme Court issued its decision in *Birchfield v. North Dakota* (2016) 579 U.S. ___ [136 S.Ct. 2160] (*Birchfield*).**9** *Birchfield* involved three consolidated cases. (*Id*. at p. ___ [136 S.Ct. at p. 2172].) In the first case, Birchfield accidentally drove his vehicle off the road and was seen by a state trooper trying unsuccessfully to drive out of a ditch. When the state trooper approached, he smelled a "strong whiff of alcohol" on Birchfield, saw that Birchfield had bloodshot and watery eyes, and observed that Birchfield spoke with a slur and struggled to remain steady on his feet. (*Id*. at p. ___ [136 S.Ct. at p. 2170].) Birchfield agreed to take field sobriety tests, but performed poorly on each. Concluding Birchfield was intoxicated, the state trooper informed Birchfield of his obligation under North Dakota law to agree to a BAC test. Birchfield consented to a roadside breath test (a preliminary alcohol screening test), which showed Birchfield had a BAC of 0.254 percent. (*Ibid*.)

After placing Birchfield under arrest for DUI, the state trooper advised Birchfield of his obligation under the North Dakota implied consent law to submit to further BAC testing, and that refusal to submit to a test would result in criminal penalties. (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2170].) Birchfield refused to submit to a blood

---

**9** We directed the parties to submit supplemental letter briefs addressing *Birchfield*. In addition, we granted a request from Paul R. Burglin of Burglin Law Offices to submit an amicus curiae brief addressing *Birchfield*.

test, and subsequently pleaded guilty to a misdemeanor charge of refusing to submit to a BAC test. (*Id.* at pp. ___ [136 S.Ct. at pp. 2170-2171].) Birchfield appealed his conviction, arguing the Fourth Amendment prohibited the state from criminalizing his refusal to submit to a blood test. Citing *McNeely*'s favorable discussion of implied consent laws, the North Dakota Supreme Court rejected Birchfield's challenge. (*Birchfield*, at p. ___ [136 S.Ct. at p. 2171].)

In the second case, police responded to a report of three apparently intoxicated men who tried unsuccessfully to pull a boat out of a boat launch but got their truck stuck in a river. (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2171].) When police officers arrived, a witness identified a man (Bernard) in his underwear as the driver. Bernard admitted to drinking, but denied that he was the driver and refused to submit to field sobriety tests. The officers smelled alcohol on Bernard's breath and saw that his eyes were bloodshot and watery, so they arrested Bernard for DUI. (*Ibid.*) At the police station, the police informed Bernard that his refusal to submit to BAC testing, as required under the Minnesota implied consent law, was a criminal offense. When asked to submit to a breath test, Bernard refused. He was charged with refusing to submit to a BAC test, but the state trial court dismissed the charges, concluding the warrantless breath test Bernard refused to take was not permitted under the Fourth Amendment. (*Birchfield*, at p. ___ [136 S.Ct. at p. 2171].) The Minnesota Supreme Court reversed, concluding a warrantless breath test is permissible under the Fourth Amendment as a search-incident-to-arrest. (*Birchfield*, at p. ___ [136 S.Ct. at p. 2171].)

In the third and final case, a police officer saw petitioner Beylund unsuccessfully turn into a driveway, almost hit a stop sign, and come to a stop while still partly in the roadway. (*Birchfield*, *supra*, 579 U.S. at pp. ___ [136 S.Ct. at pp. 2171-2172].) When the police officer walked up to Beylund's vehicle, the officer saw an empty wine glass in the center console and smelled alcohol. The officer asked Beylund to step out of his vehicle, and as he did so, Beylund struggled to keep his balance. (*Id*. at p. ___ [136 S.Ct. at p. 2172].) The officer arrested Beylund for DUI and transported him to a nearby hospital. The officer then read Beylund the North Dakota implied consent advisory, and told Beylund that his refusal to submit to a BAC test was a crime. Beylund submitted to a blood test, which showed he had a BAC of 0.250 percent. (*Ibid*.) Beylund's driver's license was suspended for two years after an administrative hearing. (*Ibid*.) He challenged that decision, arguing his consent to the blood test was coerced by the officer's warning under the implied consent law that refusal to submit to the test was a crime. The North Dakota Supreme Court rejected the challenge, concluding the penalty of license suspension for refusing to submit to a blood test was constitutional and that Beylund's consent was voluntarily given because the implied consent advisory was not misleading. (*Ibid*.)

The United States Supreme Court granted writs of certiorari in those three cases and consolidated them "in order to decide whether motorists lawfully arrested for drunk driving may be convicted of a crime or otherwise penalized for refusing to take a warrantless test measuring the alcohol in their bloodstream." (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2172].) The high court noted that success for the three

29

petitioners depended "on the proposition that the criminal law ordinarily may not compel a motorist to submit to the taking of a blood sample or to a breath test unless a warrant authorizing such testing is issued by a magistrate. If, on the other hand, such warrantless searches comport with the Fourth Amendment, it follows that a State may criminalize the refusal to comply with a demand to submit to the required testing, just as a State may make it a crime for a person to obstruct the execution of a valid search warrant. [Citations.] And by the same token, if such warrantless searches are constitutional, there is no obstacle under federal law to the admission of the results that they yield in either a criminal prosecution or a civil or administrative proceeding." (*Id*. at pp. ___ [136 S.Ct. at pp. 2172-2173].)

The Supreme Court in *Birchfield* noted that *McNeely* had acknowledged the existence of exceptions to the warrant requirement such as a search-incident-to-arrest that apply categorically rather than on a case-by-case basis, but the *McNeely* court limited its analysis to the exception that was squarely before it—the exigent circumstances doctrine. (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2174], citing *McNeely*, *supra*, 569 U.S. at p. ___ [133 S.Ct. at pp. 1558-1559 & fn. 3].) The three petitioners in *Birchfield* were searched or informed they had to submit to a search after being placed under arrest, so the court considered the issue left unaddressed in *McNeely*, to wit, "how the search-incident-to-arrest doctrine applies to breath and blood tests incident to such arrests." (*Birchfield*, at p. ___ [136 S.Ct. at p. 2174].) Because the founding era provided no guidance in determining whether warrantless breath or blood tests incident to arrest comported with the Fourth Amendment, the court examined """"the degree to which

[they] intrude[] upon an individuals' privacy and . . . the degree to which [they are] needed for the promotion of legitimate governmental interests."'" (*Birchfield*, at p. ___ [136 S.Ct. at p. 2176], quoting *Riley v. California* (2014) 573 U.S. ___, ___ [134 S.Ct. 2473, 2484].)

The Supreme Court found three reasons to reaffirm its conclusion 30 years prior that "breath tests do not 'implicat[e] significant privacy concerns.'" (*Birchfield*, *supra*, 579 U.S. at pp. ___, ___ [136 S.Ct at pp. 2176, 2178], quoting *Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 626.) First, the physical intrusion of a breath test is almost negligible because it does not require piercing of the skin and entails minimal inconvenience. (*Birchfield*, at p. ___ [136 S.Ct. at p. 2176].) Second, breath tests are only capable of revealing a person's BAC, and no sample remains for the police to possess. A blood sample, in contrast, can be stored and potentially reveal highly personal information about the person. (*Id.* at p. ___ [136 S.Ct. at p. 2177].) Finally, the court concluded participation in a breath test is unlikely to enhance the embarrassment inherent in an arrest, and the act of blowing into a breathalyzer is not inherently embarrassing and normally takes place in private. (*Ibid.*)

In contrast, the court concluded a blood test does implicate significant privacy concerns. (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2178].) Unlike a breath test, a blood test requires piercing the skin and extracting a part of the body. (*Ibid.*) "And while humans exhale air from their lungs many times per minute, humans do not continually shed blood. It is true, of course, that people voluntarily submit to the taking of blood samples as part of a physical examination, and the process involves little pain or

31

risk.  [Citation.]  Nevertheless, for many, the process is not one they relish.  It is significantly more intrusive than blowing into a tube." (*Ibid*.)  Finally, unlike a breath test, a blood test provides the police with a sample they may store and potentially test for many things other than BAC, which may result in anxiety for the person forced to submit to the blood test.  (*Ibid*.)

As for the governmental need at issue, the court reaffirmed that "[t]he States and the Federal Government have a 'paramount interest . . . in preserving the safety of . . . public highways.'" (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2178], quoting *Mackey v. Montrym* (1979) 443 U.S. 1, 17.)  Although the number of fatalities and injuries caused by drunk driving has declined, it remains the leading cause of traffic fatalities and injuries.  (*Birchfield*, at p. ___ [136 S.Ct. at p. 2178].)  The court noted the states and the federal government had enacted drunk driving and implied consent laws to reduce those fatalities and injuries.  (*Id*. at p. ___ [136 S.Ct. at p. 2179]; see *id*. at pp. ___ [136 S.Ct. at pp. 2168-2170].)  "The laws at issue in the present cases—which make it a crime to refuse to submit to a BAC test—are designed to provide an incentive to cooperate in such cases, and we conclude that they serve a very important function." (*Id*. at p. ___ [136 S.Ct. at p. 2179].)

Because the intrusion of a breath test on a motorist's privacy is slight, and the governmental need to test for BAC is great, the Supreme Court concluded a motorist may be forced to submit to a warrantless breath test incident to being placed under arrest for DUI.  (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2184].)  The Supreme Court reached a different conclusion about blood tests.  "Blood tests are significantly more

32

intrusive, and their reasonableness must be judged in light of the availability of the less invasive alternative of a breath test." (*Ibid*.) "Because breath tests are significantly less intrusive than blood tests and in most cases amply serve law enforcement interests, we conclude that a breath test, but not a blood test, may be administered as a search incident to a lawful arrest for drunk driving. As in all cases involving reasonable searches incident to arrest, a warrant is not needed in this situation." (*Id*. at p. ___ [136 S.Ct. at p. 2185].)

The Supreme Court next rejected the state's argument that warrantless blood tests incident to arrest are justified based on a motorist's implied consent. (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2185].) "It is well established that a search is reasonable when the subject consents [citation], and that sometimes consent to a search need not be express but may be fairly inferred from context [citations]. Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply. [Citations.] Petitioners do not question the constitutionality of those laws, and nothing we say here should be read to cast doubt on them. [¶] It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads." (*Ibid*.) Therefore, the court concluded a motorist may not be deemed to consent to a blood test on pain of criminal prosecution. (*Id*. at p. ___ [136 S.Ct. at p. 2186].)

Finally, the Supreme Court applied its legal conclusions to the three cases before it.  (*Birchfield*, *supra*, 579 U.S. at pp. ___ [136 S.Ct. at pp. 2186-2187].)  The court held Birchfield could not be forced to submit to a warrantless blood test incident to his arrest.  Because the record did not indicate that a breath test would not have satisfied the state's interest in testing Birchfield's BAC, and there were no exigent circumstances to support a warrantless blood test, the court held Birchfield was threatened with an unlawful search and reversed his conviction for refusing to submit to a blood test.  (*Ibid*.)  In contrast, the Supreme Court held a warrantless breath test was a permissible search incident to Bernard's arrest.  "[T]he Fourth Amendment did not require officers to obtain a warrant prior to demanding the [breath] test, *and Bernard had no right to refuse it*."  (*Ibid*., italics added)  Lastly, the court vacated Beylund's license suspension because the North Dakota Supreme Court had erroneously concluded the state could compel both blood tests and breath tests incident to arrest.  (*Ibid*.)  The Supreme Court remanded the case for a determination of whether Beylund's consent to the blood test was freely and voluntarily given in light of the inaccuracy of the officer's advisement.  (*Ibid*. & fn. 9.)

        c.     *Espinoza's purported consent to a blood test, and her failure to submit to and complete a breath test, constituted refusal to submit to a chemical test.*

The Department argues Espinoza's failure to submit to a breath test was a secondary basis for suspending her driver's license and insists we need not address breath tests because Espinoza's refusal to submit to a blood test was a primary and sufficient basis for the suspension.  True, a motorist who refuses to submit to or fails to complete one form of chemical testing need not be offered an alternative test before the motorist is

34

deemed to have refused chemical testing for purposes of the implied consent law. (*Garcia*, *supra*, 185 Cal.App.4th at pp. 87-89; *Hildebrand v. Department of Motor Vehicles* (2007) 152 Cal.App.4th 1562, 1573-1574.)  "'[T]he law of implied consent mandates that an arrestee is required to submit to and complete one of the three tests upon their first having been offered to him by an arresting officer.  [¶] . . . [¶] . . . It is the initial refusal which forms the basis for suspension of the driver's license under Vehicle Code section 13353.  [Citation.]  Once the driver refuses to take any one of the three chemical tests, the law does not require that he later be given one when he decides, for whatever reason, that he is ready to submit.  [Citations.]  [¶] . . .  Simply stated, one offer plus one rejection equals one refusal; and, one suspension.'  (*Dunlap v. Department of Motor Vehicles* (1984) 156 Cal.App.3d 279, 283 . . .; see *People v. McHugh* (2004) 119 Cal.App.4th 202, 212 . . . .)"  (*Hildebrand*, at p. 1573.)

Prior to issuance of the decision in *Birchfield*, we would have agreed with the Department that Espinoza's refusal to submit to a blood test would have been a sufficient basis for her license suspension, and we would have had no need to address breath tests. But for the reasons stated *infra*, it is unclear whether the high court would approve of a civil license suspension based solely on a motorist's refusal to submit to a warrantless blood test.  Therefore, we err on the side of caution and affirm the suspension based on Espinoza's refusal to submit to a breath test.

The police could not force Espinoza to submit to a blood test against her will unless they obtained a warrant or showed there were exigent circumstances that justified a warrantless search.  (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2174];

35

*McNeely*, *supra*, 569 U.S. at pp. ___, ___, ___ [133 S.Ct. at pp. 1561, 1563, 1568].) Consequently, we assume without deciding, that Espinoza could refuse to submit to a warrantless blood test unless the police obtained a warrant, and that, without more, her refusal to do so could not result in her license being suspended. (See *Birchfield*, at pp. ___ [136 S.Ct. at pp. 2185-2186].)

However, as the Supreme Court clearly held in *Birchfield*, the Fourth Amendment does not prohibit the police from forcing a motorist to submit to a warrantless *breath* test incident to his or her arrest, the motorist has no right to refuse to submit to a breath test or to condition his or her submission on the police obtaining a warrant, and the motorist's refusal to submit to the breath test may be the basis of criminal penalties. (*Birchfield*, *supra*, 579 U.S. at pp. ___, ___ [136 S.Ct. at pp. 2184, 2186].) In light of that clear holding, we conclude refusal to submit to a breath test incident to arrest may also be the basis of imposing civil penalties under the implied consent law, including suspension or revocation of the motorist's driver's license.

The Department nonetheless contends *Birchfield* has no application to this case. According to the Department, *Birchfield* only addressed criminal liability for refusing to submit to a chemical test, something the California implied consent law does not provide for.[10] In addition, the Department contends the high court in *Birchfield* expressly stated

---

[10] More precisely, test refusal is not a separate criminal offense in California. (*People v. Valencia* (2015) 240 Cal.App.4th Supp. 11, 19 ["the Legislature has never expressly made it a stand-alone criminal offense for a DUI arrestee to refuse to submit to a chemical test"].) Instead, a motorist's refusal to submit to or failure to complete a

*[footnote continued on next page]*

it was not holding that *civil* penalties could not be imposed if a motorist refuses to submit to a chemical test.

True, the court in *Birchfield* stated its "prior opinions have referred approvingly to the *general* concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply," and that "nothing we say here should be read to cast doubt on them." (*Birchfield*, *supra*, 579 U.S. at p. ___ [136 S.Ct. at p. 2185], italics added; see *Hall v. Superior Court* (2016) 3 Cal.App.5th 792, 802, fn. 8.) But the legality of *civil* penalties for refusing to submit to a warrantless blood test was not squarely presented in *Birchfield*. (See *Harris*, *supra*, 234 Cal.App.4th at p. 684 ["'"'"It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered."'"'"].) We remain somewhat doubtful whether the high court would approve of a civil license suspension predicated solely on a motorist's refusal to submit to a warrantless *blood* test. Rather than decide whether Espinoza's license could be lawfully suspended based solely on her refusal to submit to a warrantless blood test, we conclude

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
*[footnote continued from previous page]*
chemical test, if pleaded and proven by the prosecutor, results in increased criminal penalties if the motorist is convicted of DUI in violation of sections 23152 or 23153. (§§ 23577, 23578.)

her license was lawfully suspended because she did not submit to a warrantless breath test.

Gonzalez properly informed Espinoza that she had the obligation under section 23612 to submit to a blood *or* a breath test; that if she was incapable of completing one of those tests, she had to choose the other; and that failure to submit to or to complete a chemical test would result in her driver's license being suspended or revoked. When Espinoza said she would submit to a blood test if Gonzalez first obtained a warrant, Gonzalez told Espinoza that the policy of the CHP was only to obtain warrants for forced blood draws in felony DUI cases and that a warrant would not be obtained in Espinoza's case. Under the facts of this case, a blood test was functionally unavailable. (Cf. *White v. Department of Motor Vehicles* (2011) 196 Cal.App.4th 794, 798-800 [motorist's refusal to submit to a breath test, after she agreed to submit to a blood test but the attempt to take her blood proved unsuccessful, constituted refusal to submit to a chemical test]; *Quesada v. Orr* (1971) 14 Cal.App.3d 866, 870-871 [when a motorist chose to submit to a urine test under § 13353 but was unable to produce a sample, he was required to complete either a blood or breath test and his failure to do so constituted a refusal].)

Under the implied consent law, when either a blood test or a breath test is unavailable for whatever reason, the motorist must submit to and complete the available test (and if both blood and breath tests are unavailable, the motorist must submit to and complete a urine test). (§ 23612, subds. (a)(1)(A), (a)(2)(A), & (d)(2).) Once Espinoza stated unequivocally that she would not submit to a blood test unless Gonzalez obtained a

38

warrant, and Gonzalez made it clear a warrant would not be forthcoming and, therefore, that a blood test would not be performed, Espinoza had an affirmative obligation to submit to and complete a breath test. Espinoza did not choose to submit to a breath test, which constituted a refusal to submit to a chemical test within the meaning of section 23612.

Espinoza argues a blood test was actually available, and it was *only* the CHP's policy that rendered it unavailable. Not so. A blood test was functionally unavailable in this case because Espinoza did not give actual consent to a blood test and, instead, conditioned her purported consent on Gonzalez obtaining a warrant. Had Espinoza actually consented to a blood test, the CHP's policy would have been irrelevant.

Citing *Nelson v. City of Irvine* (9th Cir. 1998) 143 F.3d 1196, Espinoza contends she could not have been forced to submit to a breath test (or deemed to have refused to submit to a breath test by not voluntarily submitting to one) when the blood test was actually available but withheld from her for no valid reason. Even on questions of federal law, we are not bound by decisions of the lower federal courts. (*People v. Johnson* (2015) 61 Cal.4th 734, 782; *People v. Crittenden* (1994) 9 Cal.4th 83, 120, fn. 3.) Moreover, *Nelson* misconstrued California's implied consent law and is therefore unpersuasive. (*Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 119-121.) In any event, *Nelson* is distinguishable. "There the police either prevented or coerced the defendants from selecting breath or urine tests. They acted in bad faith by interfering with the defendant's choice of tests and compelling them to take blood tests." (*People v. Sugarman* (2002) 96 Cal.App.4th 210, 216.) There is no evidence here that

Gonzalez acted in bad faith or that he attempted to coerce Espinoza to take a chemical test. Instead, the record indicates Gonzalez merely informed Espinoza that, because of the CHP's post-*McNeely* policy regarding warrants for blood draws, he would not obtain one and, therefore, a blood test would not be performed. Likewise, we reject the suggestion that a blood test was unavailable for no good reason. The CHP could reasonably conclude that obtaining warrants for blood draws in every DUI case where exigent circumstances do not exist would not be a wise use of limited resources and time and, instead, reserve warrant requests for felony DUI cases.

Espinoza also argues the Department suspended her license because she invoked her right under *McNeely* to be free from warrantless, coerced blood tests, and that in doing so the Department imposed an unconstitutional condition on her maintaining the privilege to operate a motor vehicle. We disagree. "As a general matter, the unconstitutional conditions doctrine imposes special restrictions upon the government's otherwise broad authority to condition the grant of a privilege or benefit when a proposed condition requires the individual to give up or refrain from exercising a constitutional right. (See, e.g., *Perry v. Sindermann* (1972) 408 U.S. 593, 597-598 . . .; *Pickering v. Board of Education* (1968) 391 U.S. 563, 568 . . . ." (*California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 457.) Espinoza's license was not suspended merely because she invoked her right under *McNeely* to be free from a warrantless blood test, but because she refused to submit to and complete a chemical test. Had Espinoza voluntarily submitted to and completed a breath test, we would agree that her refusal to submit to a warrantless blood test, by itself, would not be a lawful basis for her license

40

suspension. Instead, Espinoza purported to consent to a blood test if Gonzalez obtained a warrant and then failed to consent to a breath test when she learned a warrant would not be forthcoming. We hold it was Espinoza's failure to submit to and to complete a breath test, and not merely her refusal to submit to a warrantless blood test, which supports her license suspension.[11]

Finally, Espinoza argues she had an affirmative right under *McNeely* to demand a blood test and to force Gonzalez to obtain a warrant, Gonzalez failed to honor her demand for a blood test with a warrant, and Espinoza had no further obligation to submit to a breath test. According to counsel, suspending Espinoza's license under these circumstances renders her rights under *McNeely* to be illusory. We cannot agree.

*McNeely* did not confer an affirmative or positive right on motorists to demand a blood test with a warrant. Instead, *McNeely* conferred a *passive* or *negative* right on motorists to be free from warrantless, coerced blood tests unless the police can establish the existence of exigent circumstances. When Gonzalez informed Espinoza that, under the CHP's policy, he would not obtain a warrant and that a forced blood test would not be administered, Gonzalez in fact honored Espinoza's rights under *McNeely*. Under *Birchfield*, however, Espinoza had no negative right to be free from a warrantless breath test incident to her lawful arrest for DUI. Therefore, suspending Espinoza's driver's

---

[11] The superior court (and the hearing officer) did not rely on refusal to submit to or failure to complete a breath test as the basis for suspending Espinoza's driver's license. But as noted, *ante*, we must affirm the judgment if it is correct on any ground. (*Shaw v. County of Santa Cruz*, *supra*, 170 Cal.App.4th at p. 269.)

license for her failure to submit to and complete a breath test in no way renders illusory Espinoza's rights under *McNeely*.

C.    *Espinoza Was Afforded a Fair Hearing.*

Lastly, Espinoza contends the hearing officer's complete rejection of D'Amico's expert testimony and errors in the hearing officer's findings show the decision did not comport with due process.  We conclude the superior court's implied finding that Espinoza obtained a fair hearing is supported by the record.

With respect to D'Amico's testimony, the parties use a considerable amount of space in their briefs discussing whether the *hearing officer* correctly found that D'Amico was biased and what if any weight the hearing officer should have given to D'Amico's expert testimony.  Regardless of whatever deference the superior court was required to accord the hearing officer's credibility findings (see Gov. Code, § 11425.50, subd. (b)), on appeal we are only concerned with the *superior court's* findings.  (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058 ["If a fundamental vested right was involved and the trial court therefore exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review."]; 2 Cal. Administrative Mandamus, *supra*, Appeal From Superior Court Judgment, § 16.51, pp. 16-36 to 16-37 ["When reviewing cases in which a trial court used the independent judgment test, the appellate court focuses on the findings made by the superior court."].)  We are not free to reweigh the evidence, and we must resolve all conflicts in the evidence in favor of the superior court's judgment.  (*Arthur*, *supra*, 184 Cal.App.4th at p. 1205.)  Appellate courts must generally defer to the superior court's resolution of questions of

42

witness credibility. (*Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1285.) By denying Espinoza's petition, the superior court impliedly rejected the contention that she did not receive a fair hearing and impliedly found D'Amico's testimony—that Gonzalez did not have probable cause to arrest Espinoza—lacked credibility and/or was entitled to little or no weight. We may not revisit or reweigh that implied resolution of credibility.

With respect to the errors in the hearing officer's ruling, we must reject Espinoza's argument. Although the decision addressed an argument Espinoza did not actually make at the administrative hearing regarding reasonable suspicion to perform a traffic stop, and it contained some minor errors (e.g., the hearing officer referred to Espinoza as the "Respondent" instead of the appellant in the hearing and as a "District Attorney" instead of a public defender, and the hearing officer referred to the decision in *Missouri v. McNeely* as "*DMV v. McNealy*"), they hardly demonstrate a lack of due process.

Finally, we do not agree with Espinoza's assertion that the decision shows the hearing officer applied the wrong legal standard when it found Gonzalez had probable cause to arrest Espinoza for DUI. The hearing officer clearly articulated her conclusion that, based on Gonzalez and Temple's observations of Espinoza, "Officer Gonzalez had reasonable cause to believe that Respondent was driving a motor vehicle while under the influence of alcohol." This was the correct standard and, as we conclude *ante*, the record supports the superior court's implied finding that Gonzalez had reasonable cause to arrest Espinoza for DUI.

V.

DISPOSITION

43

The judgment is affirmed.  Respondent shall recover its costs on appeal.

CERTIFIED FOR PUBLICATION


McKINSTER _____
                                                                                    J.

We concur:


HOLLENHORST _____
            Acting P. J.


MILLER _____
                    J.

44